**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

METSO MINERALS CANADA INC. and
METSO MINERALS INDUSTRIES, INC.,

               Petitioners,

       v.

ARCELORMITTAL EXPLOITATION
MINIÈRE CANADA and ARCELORMITTAL
CANADA INC.,

               Respondents.

Case No. 1:19-cv-3379-LAP

## MEMORANDUM OF LAW IN OPPOSITION TO
## PETITION TO CONFIRM ARBITRATION AWARD AND
## IN SUPPORT OF CROSS-PETITION TO VACATE AWARD

Thomas E. Riley
A. Robert Dawes
HERBERT SMITH FREEHILLS
NEW YORK LLP
450 Lexington Ave, 14th Floor
New York, New York 10017
Tel:  (917) 542-7600
Fax:  (917) 542-7601
Thomas.Riley@hsf.com
Robert.Dawes@hsf.com

*Attorneys for Respondents*
*ArcelorMittal Exploitation*
*Minière Canada s.e.n.c. and*
*ArcelorMittal Canada Inc.*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

FACTS ..................................................................................................................... 4

I.      The Standards Governing Vacatur of an Arbitration Award ...................... 6

II.     The Duty to Inform is Well Defined, Explicit, and Clearly
        Applicable ................................................................................................... 7

        A.      The Duty to Inform is Well Defined and Explicit ............................ 8

        B.      The Duty to Inform is Clearly Applicable ........................................ 8

III.    The Arbitrators Knew About the Existence of the Duty to Inform
        but Decided to Ignore It .............................................................................. 11

        A.      The Majority Knew of the Existence of the Duty to Inform ......... 12

        B.      The Majority Knew of the Mandatory Applicability of the
                Duty to Inform ............................................................................... 12

        C.      The Tribunal Nonetheless Decided to Ignore the Duty to
                Inform .............................................................................................. 16

IV.     The Majority Award's Improper Refusal to Apply the Controlling
        Law Led to an Erroneous Outcome ............................................................ 17

V.      The Majority's Disregard was Not a Mere Error of Law ........................... 19

CONCLUSION ..................................................................................................... 20

## TABLE OF AUTHORITIES

CASES                                                                                        PAGE(S)

*ABB Inc. v Domtar Inc.*,
　[2007] 3 R.C.S 461(Can) ......................................................................................8, 9

*Banque de Montréal v Bail Ltée*,
　[1992] 2 S.C.R. 554 (Can) ....................................................................................... 8

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
　850 F.3d 58 (2d Cir. 2018) *cert. denied*, 138 S. Ct. 557 (2017) ............................6

*Duferco Intern. Steel v. T. Klaveness Shipping*,
　333 F.3d 383 (2d Cir. 2003)....................................................................................12

*EB Safe, LLC v. Hurley*,
　No. 1:17-CV-06163 (ALC), 2018 WL 2225003 (S.D.N.Y. May 15, 2018)......................7, 11

*Fid. Brokerage Servs. LLC v. Deutsch*,
　No. 18-1774, 2019 WL 1177881 (2d Cir. Mar. 13, 2019)......................................11

*First Options of Chi., Inc. v. Kaplan*,
　514 U.S. 938 (1995)..................................................................................................7

*Hall Street Assocs., L.L.C v. Mattel, Inc.*,
　552 U.S. 576 (2008)..................................................................................................7

*Jock v. Sterling Jewelers Inc.*,
　646 F.3d 113 (2d Cir. 2011)................................................................................7, 11

*Jolen, Inc. v. Kundan Rice Mills, Ltd.*,
　No. 19-CV-1296 (PKC), 2019 WL 1552268 (S.D.N.Y. Apr. 10, 2019) ..................7

*Matteson v. Ryder Sys., Inc.*,
　99 F.3d 108 (3d Cir. 1996)........................................................................................6

*Perry v. Kingsland Capital Mgmt. LLC*,
　No. 16 CIV. 4305 (DAB), 2018 WL 1737237 (S.D.N.Y. Mar. 20, 2018) ...............7

*Porzig v. Dresdner, Kleinwort, Benson, North Am. LLC*,
　497 F.3d 133 (2d Cir. 2007)......................................................................................6

*Schwartz v. Merrill Lynch & Co., Inc.*,
　665 F.3d 444 (2d Cir.2011) ......................................................................................7

*Sobel v. Hertz Warner & Co.*,
　469 F.2d 1211 (2d Cir. 1972)....................................................................................7

*Wallace v. Buttar*,
　378 F.3d 182 (2d Cir. 2004)......................................................................................6

*Westerbeke Corp. v. Daihatsu Motor Co.*,
   304 F.3d 200 (2d Cir. 2002)..................................................................................7, 13

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*,
   126 F.3d 15 (2d Cir. 1997).............................................................................................6

**STATUTES**

9 U.S.C. 10(a) ......................................................................................................................7

9 U.S.C. § 202 .....................................................................................................................6

9 U.S.C. §§ 1 et seq. ...........................................................................................................6

Federal Arbitration Act ("FAA") .......................................................................................6

**OTHER AUTHORITIES**

Article 2102 C.C.Q. ................................................................................................PASSIM

Article 1375 C.C.Q. .............................................................................................................5

Article 1726 C.C.Q. .............................................................................................................5

Article 2100 C.C.Q. .............................................................................................................5

Article 2118 C.C.Q. .............................................................................................................5

Article 2098 C.C.Q. .............................................................................................................9

Article 1708 C.C.Q. .............................................................................................................9

Respondents ArcelorMittal Exploitation Minière Canada s.e.n.c. and ArcelorMittal Canada Inc. ("ArcelorMittal" or "Respondents") respectfully submit this Memorandum of Law in Opposition to the Petition and Motion to Confirm, Recognize, and Enforce Arbitration Award, ECF No. 1 (the "Motion" or "Mot."), filed by Petitioners Metso Minerals Canada, Inc. and Metso Minerals Industries, Inc. ("Metso" or "Petitioners"), and in support of Respondents' Cross-Petition to Vacate Arbitration Award (the "Cross-Petition"). This Memorandum is supported by the accompanying Declaration of Thomas E. Riley dated May 16, 2019, with exhibits ("Decl.").

## <u>INTRODUCTION</u>

In its Cross-Petition, ArcelorMittal seeks an order vacating an arbitration award (the "Majority Award") issued in New York, New York on March 20, 2019, by the majority of a three-member tribunal (the "Majority") in an arbitration between Petitioners and Respondents (the "Arbitration") conducted under the auspices of the International Chamber of Commerce (the "ICC") .

The Majority Award should be vacated because it manifestly disregards Article 2102 of the Civil Code of Québec ("C.C.Q."). Québec law is the governing law of the contract between the parties (the "Contract") for the design and manufacture of an autogenous grinding mill ("AG Mill"). According to legal authorities relied upon and quoted by Metso's own legal expert, "Art. 2102 C.C.[Q.] imposes a duty on a contractor to provide information **before the contract is entered into**. That provision therefore relates more to the pre-contract phase than to the actual content of the contract. One result of a breach of that rule may be that the theory of defect (lack) of consent will be applied." *See* Decl. Ex. I, Report of Metso's Expert Witness Professor Nathalie Vézina dated October 12, 2017 ("Vézina Report"), Appendix at 4, n.106 (citations omitted) (emphasis added). Critically, under Québec law, where the contemplated contract is a "contract of enterprise" (as discussed below), a **pre-**

**contractual** legal duty to inform ("Duty to Inform") one's counterparty in negotiation arises directly from Article 2102 C.C.Q. ("Article 2102") and expressly requires the contractor "to provide the client, as far as circumstances permit, with any useful information." Decl. Ex. DD, Article 2102. This is an independent, self-standing statutory duty under Québec law.

Here, the Majority specifically refused to address ArcelorMittal's cause of action arising under Article 2102, dismissing the "debate" over the cause of action as "meaningless." Decl. Ex. R, Majority Award ¶ 294.

This complete refusal to address Metso's legal duty amounted to manifest disregard of the law, even as it was described by Metso's own legal expert: (a) in a contract of enterprise, the Duty to Inform is not limited to a mere duty to inform of "defects" in a product; (b) the Duty to Inform arises *before* the contract in question is entered into; and (c) in a contract of enterprise, the Duty to Inform requires the disclosure of all information needed to allow the purchaser to make informed choices.[1] Indeed, the Majority's given reason for refusing to discuss Metso's Duty to Inform is inconsistent with its own finding that the Contract was a contract of enterprise – a finding that was also made by the Hon. Louise Otis, former appellate court judge of Québec ("Justice Otis"), in her dissenting opinion ("Justice Otis Opinion"). It was also inherently inconsistent with the Duty to Inform as described by Prof. Vézina, Metso's own legal expert.

Once the Majority found that the Contract was a contract of enterprise under Québec law, the Majority was compelled to determine whether Metso had met its statutory obligation to provide ArcelorMittal "as far as circumstances permit[ted], with **any useful information**."

---

[1] *See* Decl. Ex. R, Vézina Report ¶ 49 ("[T]he contractor must provide the client with information to enable the latter to make informed choices. This obligation, which exists at the time of the formation of the contract, is also present at the time of performance, and this operates to eliminate the formal boundary between formation and performance of the contract. However, one factor is constant: the information owed by one party to the other – which is therefore not limited to the information explicitly set out in Article 2102 C.C.Q. – is based on the deficit on the part of the party that alleges that it is owed an obligation to inform." (citing *Bail*).

Decl. Ex. DD, Article 2102, C.C.Q. (emphasis added).  This is corroborated by Justice Otis in her dissenting opinion.   In summary, the Majority's decision recognizes ArcelorMittal's cause of action arising under Article 2102, recognizes the controlling legal standard and its mandatory applicability to claims under Article 2102, recognizes that ArcelorMittal reasonably relied upon Metso for crucial information in the pre-contractual design meetings for the AG Mill, and yet refused to apply the controlling legal standard and adjudicate ArcelorMittal's cause of action for breach of Article 2102. This conscious refusal to make any determination regarding Metso's failure to notify ArcelorMittal of the risks inherent in the design of the AG Mill and other issues (pursuant to Metso's obligations under Article 2102 and *prior* to the execution of the Contract) had a devastating effect on the parties' dispute, and led to an erroneous outcome.

Indeed, the Majority Award reaches no legal conclusions whatsoever regarding the pre-contractual obligations of Metso.  Instead, the Majority limits its analysis to *post*-contractual issues, related to whether there was a defect in the AG Mill. Pre-contractual causes of action in the arbitration necessarily required separate legal analysis: the Majority's exclusive focus on post-contractual liability cannot, without more – as a matter of logic or of Québec law – subsume or eliminate Metso's antecedent, pre-contractual liability.

Notwithstanding the Majority's refusal to apply clear law, the issues raised by ArcelorMittal's allegations of pre-contractual liability based on Article 2102 go to the core of the parties' dispute. For example, ArcelorMittal may have elected to avoid contracting with Metso entirely had Metso complied with Article 2102 and disclosed the material risks that Metso perceived were inherent in its design. *See* Section IV, *infra*. As noted by Justice Otis in her opinion, "[t]he situation might have been different and **this dispute completely avoided** had Metso abided by its duty to inform." Decl. Ex. S, Justice Otis Opinion ¶ 77.  The Majority's complete refusal to undertake any analysis of ArcelorMittal's statutory cause of

3

action regarding the core issue of Metso's pre-contractual liability under Article 2102 constitutes manifest disregard of controlling law.

## FACTS

As described in more detail in the Cross-Petition, the Arbitration concerned an expansion project which took place between 2010 and 2013 at ArcelorMittal's mining complex in Mont-Wright, Québec, Canada (the "Expansion Project"). The purpose of the Expansion Project was to increase the annual production capacity of ArcelorMittal's Mont-Wright facility by eight (8) million tonnes of iron ore concentrate, through the addition of a seventh production line ("Line 7").

The main component of the Line 7 concentrator is the AG Mill. It was critical that due consideration be given to ensuring that the AG Mill was properly sized and able to draw the required power to achieve the annual production objective. The responsibility for making this determination was given to mill designers/manufacturers, who were invited to submit proposals for an AG Mill that would meet the specified design criteria. Among the mill designers was Petitioner Metso Minerals Canada Inc., with whom ArcelorMittal had a longstanding relationship spanning several decades, and who had intimate knowledge of ArcelorMittal's Mont-Wright facility. Evidence submitted by ArcelorMittal with its Statement of Claim demonstrated that Metso was aware of material risks at the pre-contractual negotiation stage that would have resulted in ArcelorMittal modifying or rejecting Metso's proposed design, if Metso had disclosed the information to ArcelorMittal. *See* Decl. Ex. G, ArcelorMittal Amended Statement of Claim ("SoC") ¶ 62.

Metso ultimately won the Contract for the AG Mill, and the parties agreed that the Contract would be governed by the laws of Québec, Canada.

Expert evidence submitted by ArcelorMittal in the Arbitration indicated that from June 2013, when commissioning work on the AG Mill began, to the period ending in June

2017, problems associated with the AG Mill resulted in over 12.5 million tons of lost iron ore production, as well as 5.5 years' worth of corrective work and delay. Decl. Ex. G, SoC ¶¶ 86, 91, 96. As part of the corrective work, the AG Mill was converted into a semi-autogenous mill ("SAG Mill"). *Id.* ¶ 93. A SAG Mill had been proposed previously by one of Metso's competitors during the bidding stage.[2] *Id.* ¶ 31.

On June 14, 2016, ArcelorMittal submitted a Request for Arbitration to the ICC, and Metso submitted an Answer on August 18, 2016. ArcelorMittal pleaded four independent, self-standing causes of action derived from Québec statute and case law, in addition to its breach of contract claims: (i) breach of the legal warranty of quality (Article 1726, C.C.Q.); (ii) breach of the warranty against loss of work (Article 2118, C.C.Q.); (iii) the duty to act in good faith, in the best interests of ArcelorMittal, and with prudence and diligence (Articles 1375 and 2100, C.C.Q.); and (iv) the Duty to Inform (Articles 1375, 2102, C.C.Q.; Contract §§ 4.1-4.2). *See* Decl. Ex. N, Arbitration Hearing Transcript ("Tr.") at 84: 2-17; Decl. Ex. G, SoC ¶ 98; *cf.* Decl. Ex. R, Majority Award ¶¶ 175-229.

Following briefing, a merits hearing, and post-hearing briefs in the Arbitration, on March 20, 2019, two of the members of the tribunal (Mr. Jesse B. Grove III, co-arbitrator, and Mr. Yves Derains, President) issued the Majority Award, dismissing ArcelorMittal's claims and awarding Metso most of its fees and costs. *See* Decl. Ex. R, Majority Award. On the same date, in a separate, dissenting opinion, the Hon. Louise Otis, the only member of the Tribunal duly qualified in Québec, issued a lengthy and reasoned dissenting opinion concluding that Metso failed to abide by its Duty to Inform under Québec civil law and as required by the Contract. *See* Decl. Ex. S, Justice Otis Opinion.

Metso filed its Petition to confirm the Majority Award in this Court on April 16, 2019.

---

[2] An AG Mill only uses the tumbling of the rocks inserted in the large cylinder to cause the breakage of the other rocks located inside in order to achieve size reduction, whereas a SAG Mill also uses steel grinding balls which are inserted in the cylinder to increase this effect. Decl. Ex. G, SoC ¶ 32.

## ARGUMENT

The Court should vacate the Majority Award because it manifestly disregarded the Duty to Inform under Article 2102 of the Civil Code of Québec law – although the existence, relevance, and **mandatory** applicability of the Duty to Inform were all thoroughly briefed – **and undisputed** – by the parties.

### I.     The Standards Governing Vacatur of an Arbitration Award

An arbitration award made by a New York-seated tribunal involving one domestic and one foreign party (here, Metso, a citizen of Wisconsin, and ArcelorMittal, a citizen of Canada) is a "nondomestic" award governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), 9 U.S.C. § 202, and by the provisions of Chapter 1 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq*. (to the extent that they present no conflict or inconsistency with the Convention). *Id.* at § 208; *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 73 (2d Cir. 2018) *cert. denied*, 138 S. Ct. 557 (2017).

Arbitral awards are not "impervious to judicial review." *Porzig v. Dresdner, Kleinwort, Benson, North Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007). "[C]ourts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators." *Matteson v. Ryder Systems, Inc.*, 99 F.3d 108, 113 (3d Cir. 1996). This Court holds primary jurisdiction over the Majority Award, meaning it is "free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) ("[T]he court may apply FAA standards to a motion to vacate a nondomestic award rendered in the United States.").

Vacatur of an arbitral award is "not an occasion for *de novo* review" of the tribunal's legal reasoning. *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004). Rather, it consists of

"just the limited review needed," preserving the federal policy in favor of arbitrating disputes. *Hall Street Assocs., L.L.C v. Mattel, Inc.*, 552 U.S. 576, 588 (2008).

In addition to the four statutory grounds for vacatur enumerated at 9 U.S.C. § 10(a), the Second Circuit Court of Appeals has consistently recognized that vacatur is appropriate "where the award shows a 'manifest disregard' of the law or of the terms of the parties' agreement." *Jolen, Inc. v. Kundan Rice Mills, Ltd.*, No. 19-CV-1296 (PKC), 2019 WL 1552268, at *1 (S.D.N.Y. Apr. 10, 2019) (citing *Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 451-52 (2d Cir. 2011) (citations omitted)). A court sitting in primary jurisdiction has a duty to vacate an arbitral award where manifest disregard of law is found. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995); *see also Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200 (2d Cir. 2002); *Sobel v. Hertz Warner & Co.*, 469 F.2d 1211, 1214 (2d Cir. 1972).

Vacatur for manifest disregard of the law is proper where: (1) "the governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable," and (2) "the arbitrator knew about the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it." *EB Safe, LLC v. Hurley*, No. 1:17-CV-06163 (ALC), 2018 WL 2225003, at *2 (S.D.N.Y. May 15, 2018) (quoting *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011)). Courts in the Second Circuit also consider "whether the law was in fact improperly applied, leading to an erroneous outcome." *Perry v. Kingsland Capital Mgmt. LLC*, No. 16 CIV. 4305 (DAB), 2018 WL 1737237, at *3 (S.D.N.Y. Mar. 20, 2018). Here, all of these elements are satisfied.

## II.     The Duty to Inform is Well Defined, Explicit, and Clearly Applicable

Pursuant to Section 10 of the Contract and Section 41 of its Appendix 17, this dispute was to be governed by the laws of the province of Québec. As described below, the legal Duty to Inform in accordance with Article 2102 is "well defined, explicit, and clearly

7

applicable" to this case. *See* Decl. Ex. T, *Banque de Montréal v Bail Ltée*, [1992] 2 SCR 554

("*Bail*"); Decl. Ex. U, *ABB Inc. v Domtar Inc.*, [2007] 3 SCR 461 ("*Domtar*").

### A.  The Duty to Inform is Well Defined and Explicit

The pre-contractual Duty to Inform as an independent legal duty was explicitly

defined in 1992 by the Supreme Court of Canada, the nation's highest court, in *Banque de*

*Montréal v Bail Ltée*, [1992] 2 SCR 554, which held that the Duty to Inform has three

requirements:

> 1.  "Knowledge of the information, whether actual or presumed, by the party which owes the obligation to inform";
> 2.  "The fact that the information in question is of decisive importance"; and
> 3.  "The fact that it is impossible for the party to whom the duty to inform is owed to inform itself, or that the creditor is legitimately relying on the debtor of the obligation."

Decl. Ex. T, *Bail*, 2 SCR at 586-87; Decl. Ex. G, SoC ¶ 190.

Two years later, in 1994, the Duty to Inform was then expressly codified as a self-

standing source of pre-contractual liability under Québec law in Article 2102 of the C.C.Q.:

> 2102. Before the contract is entered into, the contractor or the provider of services is bound to provide the client, as far as circumstances permit, with any useful information concerning the nature of the task which he undertakes to perform and the property and time required for that task.

Decl. Ex. DD, Article 2102, C.C.Q. *See also* Decl. Ex. R, Vézina Report ¶ 49 ("[T]he

contractor must provide the client with information to enable the latter to make informed

choices. This obligation, which exists at the time of the formation of the contract, is also

present at the time of performance. . . .").

### B.  The Duty to Inform is Clearly Applicable

Metso has acknowledged the applicability of the *Bail* standard to the Duty to Inform

pursuant to Article 2102. *See* Decl. Ex. Q, Metso Post-Hearing Memorial ¶ 21.2; Decl. Ex.

M, Metso Statement of Rejoinder ¶ 36.1; Decl. Ex. I, Vézina Report ¶ 44; Decl. Ex. R,

Majority Award ¶¶ 218, 248; Decl. Ex. S, Justice Otis Opinion ¶¶ 35-37. As Metso has

pointed out, the Supreme Court of Canada in *Bail* emphasized that the Duty to Inform exists

both during the pre-contractual and contractual phases of the parties' relationship. *See* Decl.

Ex. Q, Metso Post-Hearing Memorial ¶ 21.1. Québec courts applying the Duty to Inform

have also stressed that it is not enough for a party to a contract to answer the questions raised

by its contracting partner(s), and if doubts exist as to the completeness or accuracy of the

information provided, those doubts must be communicated to the other parties to the contract.

Decl. Ex. I, Vézina Report ¶ 49.[3]  It also flows from the Supreme Court of Canada's decision

in *ABB Inc. v Domtar Inc.*, [2007] 3 SCR 461, that the fact that both parties have expertise in

the area in which the contract is performed does not extinguish the contractor's Duty to

Inform. *See* Decl. Ex. U, *Domtar*, 3 SCR at 461, ¶ 44. Thus, parties considered to be

professionals with knowledge of the work being carried out are also entitled to the various

protections provided for in the C.C.Q.

　　　The Majority's manifest disregard of Québec law is even clearer in light of its

acknowledgement that the Contract was a contract of enterprise.  As the parties briefed

extensively, and as the Arbitration record makes clear, the Duty to Inform under Article 2102

is made explicitly applicable here because the Contract was found by the Majority to be a

contract of enterprise under Québec law (governed by Article 2098 of the C.C.Q.), rather than

a contract for sale (governed by Article 1708 C.C.Q.). *See* Decl. Ex. R, Majority Award

¶ 278. As Justice Otis noted in her opinion, "Article 2102 of the [C.C.Q.] applies to the case

at hand as a consequence of the qualification of the [Contract] as a contract of enterprise."

Decl. Ex. S, Justice Otis Opinion ¶¶ 33-34. Thus, the Majority's conclusion that the Contract

---

[3] Decl. Ex. I, Vezina Report, Appendix at 104 (citing Didier Lluelles & Benoît Moore, *Droit des obligations*, 2nd ed., Montréal, Éditions Thémis, 2012, ¶ 2009), 106 n.217 (citing *Association de la construction du Québec v Entreprises Yves M. Caron, J.E.* 2003-312 (C.S.)).

was a contract of enterprise mandates the application of the Duty to Inform to the parties'
dispute.

As also noted in the Justice Otis Opinion (Decl. Ex. S, ¶¶ 43-44), Sections 4.1 and 4.2
of the Contract—reflecting Article 2102—expressly applied the Duty to Inform to the parties'
performance under Contract, including at the **pre-contractual** or negotiation stage.  Section
4.1 provides that "[Metso] has a duty of advice, information and proposal **at every stage of
the negotiation** and performance of [the Contract]." Decl. Ex. A, Contract § 4.1 (emphasis
added).

The Majority Award acknowledged that the Contract was a contract of enterprise:

> The Arbitral Tribunal's analysis in paragraphs 260 *et seq.* above shows . . .
> that the Parties wanted Metso to be actively involved in the design
> process, and that the terms of the Contract reflect such intention. Indeed,
> the above cited articles of the Technical Specification underline that the
> vendor had to "to [*sic*] determine mill size" or that it had to "design the
> autogenous grinding mill and auxiliaries" which goes clearly beyond a
> mere obligation to sell. Decl. Ex. R, Majority Award ¶ 276.

And it found that far from playing a "merely accessory" role in the mill design,
Metso's expertise was of central importance:

> Metso's intervention in the design process, as described by Metso itself,
> was a key element of its contractual performance. Indeed, it has been
> shown that if Metso had to comply with the specifications determined by
> ArcelorMittal/BBC/SNC, **it also had to analyze these requirements and
> on the basis of its own analysis propose and build a Mill** which size
> could permit the respect of such requirements. The discussions between
> the Parties on that question, which lasted for months, evidence that
> **ArcelorMittal relied on Metso's expertise as a mill designer to achieve
> its objective** and that Metso's work in that regard was not 'merely
> accessory' to the value of the AG Mill. *Id.* at ¶ 278 (emphasis added).

The Majority then concluded that the Contract was a contract of enterprise, with
ArcelorMittal placing great trust and reliance on Metso:

> No doubt that such was the case as already explained.  ArcelorMittal in
> fact could not have determined the size of the mill to comply with the
> requirements without Metso. In fact, as rightly emphasized by
> ArcelorMittal, it "did not purchase a product already manufactured but one
> that was designed and built specially for it." *Id.* at ¶ 278.

The report submitted by Prof. Vézina, Metso's legal expert, states that under a contract for sale, "a large part" of the required disclosure stems from "actual or presumed knowledge of the defect that affects the property," and that a seller must "give notice of the defect" of which the seller is aware. Decl. Ex. I, Vézina Report ¶ 48. In contrast, she also says that in a contract of enterprise, the Duty to Inform "takes a different form" pursuant to which the contractor "must provide the client with information to enable the latter to make informed choices." *Id.* at ¶ 49.

### III.  The Arbitrators Knew About the Existence of the Duty to Inform but Decided to Ignore It

The Majority Award also meets the second requirement for vacatur: the arbitrators "knew about the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it." *EB Safe, LLC v. Hurley*, No. 1:17-CV-06163 (ALC), 2018 WL 2225003, at *2 (S.D.N.Y. May 15, 2018); *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011)). Indeed, the Majority Award expressly acknowledged the parties' extensive briefing and "debate" on the issue of the legal Duty to Inform under both Article 2102 and the Contract. Moreover, the Majority cannot have been in doubt as to the Duty to Inform, given the substantial and fully reasoned dissenting opinion on this point from Justice Otis. Nonetheless, the Majority dismissed the "debate" among the parties and disregarded the unequivocally relevant Duty to Inform as "meaningless." The Majority Award stated:

> The majority of the Arbitral Tribunal thus could conclude that ArcelorMittal's allegation that the AG Mill provided by Metso was defective has not been established. **On this basis, the majority of the Arbitral Tribunal is satisfied that the debate regarding Metso's duty to inform ArcelorMittal of possible defects of the AG Mill is meaningless and that it does not need to discuss it.** Decl. Ex. R, Majority Award ¶ 294 (emphasis added).

As described below in more detail, the governing law with respect to the Duty to Inform was intentionally ignored. *See Fid. Brokerage Servs. LLC v. Deutsch*, No. 18-1774,

2019 WL 1177881, at *1 (2d Cir. Mar. 13, 2019) (reciting the standard for manifest disregard of the law).

### A. The Majority Knew of the Existence of the Duty to Inform

First, as described above, the Majority was clearly aware of the Duty to Inform as a governing legal principle. The determination as to whether a tribunal knew of the existence of an applicable legal standard is a question of law. *Duferco Intern. Steel v. T. Klaveness Shipping*, 333 F.3d 383, 390 (2d Cir. 2003). An arbitrator is deemed to be "aware" and have "knowledge" of those issues that were specifically identified by the parties in their submissions in the course of the arbitration. *Id.* The parties here did not dispute the existence of the Duty to Inform. Decl. Ex. S, Justice Otis Opinion ¶ 44. Metso's own Post-Hearing Memorial described it as follows:

> The contractual duty to inform (or duty to warn) requires that, **before the contract is entered into**, the contractor or the provider of services is bound to provide the client with any useful information concerning the nature of the task that he undertakes to perform, the materials used, and time required. This obligation is based on the duty of good faith in contractual relations. Decl. Ex. Q, Metso Post-Hearing Memorial, ¶ 21.1 (emphasis added).

There also appeared to be agreement among the parties as to what the Duty to Inform entails. The Majority Award acknowledges that Metso argued that the Duty to Inform "requires that, before the contract is entered into, the contractor or provider of the services provide its client with any useful information concerning the nature of the task that they undertake to perform, the materials used and the time required." Decl. Ex. R, Majority Award ¶ 248. Thus, there can be no doubt that the Majority knew of the existence of the Duty to Inform under Québec law.

### B. The Majority Knew of the Mandatory Applicability of the Duty to Inform

It is also undisputed between the parties that the Duty to Inform enshrined in Article 2102 of the C.C.Q. was explicitly applicable to this dispute. A legal principle clearly governs

the resolution of an issue before the arbitrator if its applicability is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 209 (2d Cir. 2002) (citation omitted). Here, the parties extensively briefed the scope and effect of the Duty to Inform, but did not dispute its applicability. After all, the Duty to Inform was not only expressly mandated by Article 2102 – it was also "explicitly included in the [C]ontract" (*id.* ¶ 7).

For example, ArcelorMittal cited Article 2102 of the C.C.Q. and referenced Canadian Supreme Court authority on the subject. Decl. Ex. R, Majority Award ¶ 218. Similarly, Metso responded to these arguments with considerable discussion in its submissions in the Arbitration. *Id.* at ¶ 248. Indeed, the Majority Award cites the parties' briefing on the Duty to Inform without offering any comment. *Id.* at 218. The Justice Otis Opinion notes the parties' briefing as the basis for its discussion of the Duty to Inform, which it refers to as "a pervasive concept in Québec civil law." Decl. Ex. S, Justice Otis Opinion ¶ 28. Knowledge and awareness of the Duty to Inform must therefore be imputed to the Majority of the arbitral tribunal as a matter of law.

Metso's Québec law expert also discussed the *Bail* decision at length, describing it as "without a doubt, one of the most important contributions in this regard." Decl. Ex. I, Vézina Report ¶ 44. Prof. Vézina described the duty in very broad terms:

> The general principles laid down by the highest court go beyond the specific facts of the case which was before it and contribute to delineating the obligations which are incumbent on the parties in any type of contract. The Court noted that the informational deficit lies at the origin of the development of the duty to inform that is imposed on a contracting party to the benefit of others, whether they be a cocontracting party or a third party. *Id.*

ArcelorMittal, for their part, argued forcefully in the Arbitration that Metso breached the Duty to Inform:

> Metso . . . had the duty, **before the Contract was entered into**, to inform ArcelorMittal with any useful information concerning the nature of the task that it undertook to perform . . . Metso should have informed it of the risks with respect to the AG Mill or that it would be unable to perform according to the design study. More particularly, Metso did not inform ArcelorMittal of the concerns that were identified internally regarding the 36' x 25' AG Mill.

Decl. Ex. R, Majority Award ¶ 218 (emphasis added). *See also* Decl. Ex. G, SoC ¶¶ 195-196; Decl. Ex. P, ArcelorMittal Post-Hearing Brief ¶ 94.

Thus, Metso's breach of its Duty to Inform was at the heart of the dispute between the parties, and clearly treated as "explicitly applicable" – and yet the Majority, despite acknowledging the existence and undisputed, mandatory applicability of the Duty to Inform, ignored the law ("the majority of the Arbitral Tribunal . . . does not need to discuss it") and dismissed it as "meaningless." Decl. Ex. R, Majority Award ¶ 294.

In addition to the parties' extensive briefs, and in addition to the Majority's determination that the Contract was a contract of enterprise under Québec law, the Majority directly acknowledged various factual predicates which compel the conclusion that the Duty to Inform was applicable to this dispute. Thus, even if the Majority's Award were deemed ambiguous (it is not; the Majority expressly refused to adjudicate the claim under Article 2102 as "meaningless"), the evidence presented cannot support an inference that the Majority properly applied the controlling legal standard. On the contrary, the Majority's findings of fact expressly recognize that (i) Metso possessed information of material importance and (ii) ArcelorMittal reasonably relied on Metso in the pre-contractual negotiations. For example, the Majority acknowledged that:

- Metso "played a crucial role in the choosing of the AG Mill size." Decl. Ex. R, Majority Award ¶ 262.

- "Metso was a specialist in the field and that ArcelorMittal was relying on its experience for the Line 7 project." *Id.* at ¶ 262.

- The "[v]endor is to determine mill size and power for mill required to achieve the production objectives based on ore characteristics and information

provided in the datasheet." *Id.* at ¶ 264 (quoting Article 1.2.1 of the Technical Specification).

- "[T]he Vendor shall design the autogenous grinding mill and auxiliaries in accordance with this specification, the applicable codes and standards, reference specifications, drawings/datasheets and local, provincial and federal government regulations, and shall ensure that the equipment is suitable for the use specified." *Id.* at ¶ 265 (quoting Article 2.5 of the Technical Specification).

- Metso "has the duty to ensure that it is then 'suitable for the use specified' i.e., to permit Line 7 to produce 8 million tonnes of iron concentrate per year." *Id.* at ¶ 266.

- The Majority was "satisfied that Metso was the one that had to advise on the size of the mill taking into the design criteria incorporated in the datasheet in order to find the best suitable mill to achieve ArcelorMittal's objective of production on Line 7.  Further, Metso also had to respect ArcelorMittal's wish not to use a mill of a type that would not have been used before as well as a mill that would have a ring motor. . . . Thus, the Arbitral Tribunal finds that although Metso had indeed a certain number of constraints to respect when proposing the most appropriate size mill, it remains that, based on it experience, it was the only one able to recommend the proper size."  *Id.* at ¶ 267.

- "Due consideration" must be given to "assuring" that "the proposed mill is able to draw the required power (based on throughput, ore hardness, mill speed and % loading of the mill)." *Id.* at ¶ 269 (quoting Technical Recommendations to bidders).

- "[I]t was clear from the proposals that the required mill capacity was pushing the limit of 36' AG mills." *Id.* at ¶ 269.

- "Again, this shows in the Arbitral Tribunal's mind that the size of the mill was determined by the vendors, and more particularly by Metso, as it was in the best position with its expertise, to select the most suited mill for Line 7." *Id.*

- "Metso was thus to propose the mill size in order to comply with the requirements of ArcelorMittal." *Id.* at ¶ 270.

- Metso wrote to BBA expressing thanks for "holding an engaging discussion to arrive at the best suitable mill size for your specific needs." *Id.*

The Majority Award also used the term "size" roughly to include power requirements ("the HP of the motors"), noting that "it would be up to the bidders to propose an AG Mill that would be able to meet the requirements of the Expansion Project." *Id.* (quoting Bruno Audet witness statement).

In summary, the Majority stated:

> To conclude, the Arbitral Tribunal is thus convinced that Metso, as a specialist in the mining industry, was responsible to advise ArcelorMittal and provide it with the most appropriate size mill to comply with the specifications of Appendix D and to meet the objectives of ArcelorMittal in terms of production. In other words, the Arbitral Tribunal finds that although ArcelorMittal, with the help of BBA and SNC, have fixed the design criteria, Metso had the most crucial and determinative role in the design of the mill as it had to determine what mill was to be supplied, and specifically what size of the mill was needed to meet ArcelorMittal's design criteria and objective. Decl. Ex. R, Majority Award ¶ 271.

And as articulated by Justice Otis at Section 4.3 of her Opinion:

> [T]here is no doubt that the information at issue, namely that the AG Mill designed by SNC and BBA was unable to allow ArcelorMittal to increase the capacity of its Mont-Wright iron plant by a production of 8 Mt/y iron concentrate or raised risks and / or concerns with respect to the ability of the Mill to achieve this objective, is of the upmost and decisive importance. Having the appropriate Mill is critical in order for ArcelorMittal to reach its production objective and this objective is the reason itself why ArcelorMittal engaged in the expansion project in the first place. There is no doubt as to the materiality or importance of that information. Decl. Ex. S, Justice Otis Opinion § 4.3.

Thus, the existence, relevance, and mandatory applicability of this well-defined and explicit standard controlling claims under Article 2102 was thoroughly briefed by the parties, not meaningfully disputed, and acknowledged by the Tribunal.

### C.  The Tribunal Nonetheless Decided to Ignore the Duty to Inform

As described above, the Majority Award concluded that the Duty to Inform is "meaningless," on the mere ground that a "defect" in the AG Mill had not been established. However, because the Duty to Inform exists even before the time of a contract's formation, one could not use the existence of a defect to determine whether the Duty to Inform has been breached. *See* Decl. Ex. Q, Metso Post-Hearing Memorial ¶ 588. The buyer must be informed at the outset, so that the terms of the contract can be properly formulated. Under Québec law, one cannot look back to say that because the product conformed to the contract, there was no

defect, so the Duty to Inform is meaningless; rather than viewing the issue in hindsight, one must consider what the buyer should have been told before entering into the contract. Thus, the absence of a defect cannot obviate the Duty to Inform under a contract of enterprise.

Moreover, there is an irreconcilable inconsistency between the Majority's finding that the Contract was a contract of enterprise and the Majority's refusal to adjudicate ArcelorMittal's cause of action under Article 2102 on the ground that it was "meaningless." This is also inconsistent with the governing principles set forth in *Domtar*, where the Supreme Court of Canada explained that the Duty to Inform requires a separate analysis independent of whether a "defect" is found to be present:

> Furthermore, the scope of the general duty to inform is much broader than that of the disclosure of a latent defect. This duty encompasses any information that is of decisive importance for a party to a contract, as Gonthier J. cited in Bail (see pp. 586-87). *It is therefore easy to imagine a situation in which a seller would be in breach of the duty even though no latent defect exists.* Decl. Ex. U, *Domtar*, 3 SCR at 461, ¶ 108 (emphasis added).

Metso's own legal expert, Prof. Vézina, also characterizes the Duty to Inform under a contract of enterprise such that the mere lack of a defect would not render the duty "meaningless" under such a contract. *See* Decl. Ex. I, Vézina Report ¶ 49.

The only way for the Majority to have reached the conclusions it did was to disregard Québec law on the Duty to Inform,[4] i.e., that the Duty to Inform expressly applies to the pre-contractual conduct of the parties pursuant to Article 2102.

## IV.   The Majority Award's Improper Refusal to Apply the Controlling Law Led to an Erroneous Outcome

The Majority disregarded the law by failing to apply the controlling legal standard at all, resulting in an erroneous outcome in the Arbitration. Evidence submitted by

---

[4] It is also noteworthy that the parties had set aside an additional hearing day in the Arbitration as needed for the Tribunal to ask any questions of the parties that it wished to pursue, but the Tribunal decided to cancel this day and forego any such questioning.

ArcelorMittal in the Arbitration demonstrated that Metso was aware of information and material risks at the pre-contractual negotiation stage that would have resulted in ArcelorMittal modifying or rejecting Metso's proposed design, if Metso had disclosed the information to ArcelorMittal. *See* Decl. Ex. G, SoC ¶ 62.

First, Metso failed to disclose that its design was unprecedented. ArcelorMittal instructed all bidding companies (and the Contract later required) that only "proven technology" be used in the mill design. Decl. Ex. P, ArcelorMittal Post-Hearing Brief ¶ 93. Metso represented to ArcelorMittal that it had designed, and built mills of the same specifications as the AG Mill before. Decl. Ex. L, ArcelorMittal Statement of Reply ¶¶ 36, 38. However, Metso had never designed and supplied a mill of the same specifications as the AG Mill. Decl. Ex. G, SoC ¶ 195. In testimony during the Arbitration, a key manager at Metso, who led the negotiations with ArcelorMittal, indicated that Metso believed its unprecedented and untested design represented "unchartered waters," but Metso failed to disclose this to ArcelorMittal. Decl. Ex. P, ArcelorMittal Post-Hearing Brief ¶ 93.

Second, Metso had identified and internally discussed a "series of risks" with its proposed mill design, but failed to communicate these risks to ArcelorMittal during pre-contractual negotiations or at any time during its performance under the Contract. *Id.* For example, Metso did not at any time disclose that achieving 8 million tons of production per year with its design would require "overloading and overspeeding" the AG Mill in a way that would have been both unsustainable and unsafe. *Id.* at ¶ 68. Indeed, Metso admitted that it failed to follow "industry standard[s]" in its design (*id.* at ¶ 69), and yet failed to given any written warnings of any kind to ArcelorMittal. *Id.* at ¶ 6. While Metso had actual knowledge of such material risks inherent in its design, Metso never communicated these risks to ArcelorMittal. Decl. Ex. G, SoC ¶ 196.

Finally, it was uncontested in the Arbitration that after being notified of the performance issues in January 2014, Metso accepted that corrective work on the AG Mill was needed and proposed corrective measures. Decl. Ex. G, SoC ¶¶ 70-75. As Metso admitted on June 29, 2015, "[t]he AG [Mill Line] #7 at ArcelorMittal Mont Wright (AMMW) has not been reaching and maintaining its design capacity since installation." *Id.* at ¶ 73. It was also undisputed that when Metso's proposed corrective work failed to resolve the production issues, Metso refused to perform further corrective work or to otherwise advise or inform ArcelorMittal of relevant information in relation to improving the AG Mill's performance. *Id.* at ¶ 75.

As mentioned above, ArcelorMittal submitted evidence in the Arbitration demonstrating that, if Metso had informed ArcelorMittal of this information at the pre-contractual negotiation stage, as it was obligated to do under Québec law, ArcelorMittal would have modified or rejected Metso's proposed design, or may have avoided entering into the Contract altogether. *See id.* at ¶ 62. As also noted above, had Metso informed ArcelorMittal of this information, ArcelorMittal may have instead contracted to construct a SAG Mill from the outset, instead of first contracting with Metso and then later attempting to remedy the situation by contracting to purchase a SAG Mill in any event. *Id.*

## V.    The Majority's Disregard was Not a Mere Error of Law

Finally, though Metso may claim otherwise, the Majority Award's manifest disregard of Québec law was much more than a mere error of law. Despite having recognized the controlling legal standard, it did not analyze or apply the parties' extensive briefing on the Duty to Inform at all, consciously and explicitly excluding it from its analysis as "meaningless." The Majority only analyzed whether the AG Mill was "defective," which was a separate inquiry under Québec law, before disregarding the "debate" over the Duty to Inform. Decl. Ex. R, Majority Award ¶ 294. As discussed above, the Majority also concluded

that the Contract was a contract of enterprise under Québec law – which mandated, without more, that the Majority conduct an inquiry into the Duty to Inform, even according to Metso's own expert. Decl. Ex. I, Vézina Report ¶¶ 48, 49.

The parties in the Arbitration did not dispute the existence or applicability of the law on these points. Their argument concerned only the significance of the facts under the accepted standard. Further, as described above, the Majority 's decision to forgo *any* legal analysis of ArcelorMittal's cause of action for breach of Article 2102, despite its awareness and acknowledgement of a controlling legal standard, was express and blatantly conscious.

## CONCLUSION

Under Article 2102 of the Civil Code of Québec, the Duty to Inform constitutes a separate, pre-contractual, statutory basis for liability in relation to Metso's conduct during the negotiations for the Contract, which was thoroughly argued by both parties, and existed as an independent claim quite apart from the alleged existence of a "defect" in the AG Mill or from the parties' performance (or lack thereof) under the Contract. ArcelorMittal's claim under Article 2102 required the tribunal to determine whether Metso failed to inform ArcelorMittal of any material or important issues relating to the project **prior to entering the Contract**. It also required the tribunal to assess whether that information would have affected the enterprise as a whole – as ArcelorMittal claimed it would have – potentially resulting in modification of the terms of the Contract that the parties negotiated and entered into in reliance on Metso's expertise, or even in the Contract being avoided entirely and the AG Mill never being purchased. The testimony of ArcelorMittal's fact witnesses is that they would not have purchased the AG Mill if they had been warned of risks to achieving their objectives.

Because the Majority Award was issued in manifest disregard of the Duty to Inform under Article 2102, resulting in an erroneous outcome contrary to the principles of Québec law, ArcelorMittal respectfully requests that the Court vacate the Majority Award.

Dated: New York, New York
      May 16, 2019

Respectfully submitted,

HERBERT SMITH FREEHILLS
NEW YORK LLP

By:  */s/ Thomas E. Riley*  _____

Thomas E. Riley
A. Robert Dawes
450 Lexington Ave, 14th Floor
New York, New York 10017
Tel:  (917) 542-7600
Fax:  (917) 542-7601
Thomas.Riley@hsf.com
Robert.Dawes@hsf.com

*Attorneys for Respondents ArcelorMittal*
*Exploitation Minière Canada s.e.n.c. and*
*ArcelorMittal Canada Inc.*