# EXHIBIT HH

<u>ICSID Case No ARB/05/19</u>

**HELNAN INTERNATIONAL HOTELS A/S**

<u>Applicant</u>

**and**

**ARAB REPUBLIC OF EGYPT**

<u>Respondent</u>

<u>(Annulment Proceeding)</u>

———————————————————————

**Decision of the *ad hoc* Committee**
_____

**Members of the Committee**

Judge Stephen M. Schwebel (President)
Judge Bola Ajibola
Professor Campbell McLachlan QC

**Secretary of the Committee**

Natalí Sequeira

| *Representing the Applicant:* | *Representing the Respondent:* |
|---|---|
| Mr. Michael P. Lennon, Jr. | Mr. Jan Paulsson |
| Mr. Alejandro Escobar | Freshfields Bruckhaus Deringer |
| Ms. Ania Farren | Paris, France |
| Baker Botts (UK) LLP | |
| London, England | Councillor Sidky Kalousy |
| | Councillor Ahmed Saad |
| Mr. Jay Alexander | State Lawsuits Authority |
| Baker Botts LLP | Cairo, Egypt |
| Washington D.C., U.S.A. | |
| | Mr. Karim Hafez |
| Mr. Peter Griffin | HAFEZ |
| Slaney Advisors | Cairo, Egypt |
| London, England | |

***Date of dispatch to the parties:*** June 14, 2010

# Table of Contents

I.    Procedural History .................................................................................... 3

II.   Background ............................................................................................... 4

III.  Treaty consequences of plan to terminate the Management Contract ................ 6

    (a)    Helnan's case ................................................................................ 6
    (b)    Egypt's Reply ................................................................................ 7
    (c)    The Tribunal's Approach .................................................................. 8
    (d)    The Committee's Analysis ................................................................ 8

IV.   Effect of failure to challenge the downgrade in the Egyptian Courts ................ 12

    (a)    Helnan's case .............................................................................. 12
    (b)    Egypt's Reply .............................................................................. 13
    (c)    The Committee's Analysis .............................................................. 13

V.    Characterisation of the dispute as contractual in nature .................... 21

    (a)    Helnan's Case ............................................................................. 21
    (b)    Egypt's Reply .............................................................................. 22
    (c)    The Committee's Analysis .............................................................. 22

VI.   Lack of legal causality ............................................................................ 24

    (a)    Helnan's Case ............................................................................. 24
    (b)    Egypt's Reply .............................................................................. 24
    (c)    The Committee's Analysis .............................................................. 25

VII.  Egypt's Alternative Plea ......................................................................... 25

VIII. Decision of the ad hoc Committee .......................................................... 26

## I.   PROCEDURAL HISTORY

1.  On 30 October 2008, the International Centre for the Settlement of Investment Disputes ('ICSID' or 'the Centre') received from Helnan International Hotels A/S (formerly Scandinavian Management Co. A/S) ('Helnan' or 'the Applicant')', an Application for Annulment of the Award rendered on 3 July 2008 in the arbitration proceeding between Helnan and the Arab Republic of Egypt ('Egypt' or 'the Respondent'), by the Arbitral Tribunal comprised of Mr. Yves Derains (Chairman), Professor Rudolf Dolzer and Mr. Michael Lee ('the Tribunal'), in a dispute arising under the Bilateral Investment Treaty dated 24 June 1999 between the Arab Republic of Egypt and the Kingdom of Denmark ('the BIT').

2.  The Application for Annulment was submitted within the time period provided for by Article 52(2) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ('the ICSID Convention'). On 10 November 2008, the Centre registered the Application for Annulment.

3.  On 22 December 2008, an *ad hoc* Committee composed of Judge Stephen M. Schwebel (President), Judge Bola A. Ajibola, and Professor Campbell A. McLachlan, was constituted to pass upon that Application. Ms. Natalí Sequeira was designated by ICSID to serve as Secretary of the Committee.

4.  The Committee held its first procedural session with the parties at the seat of the Centre in Washington, D.C. on 6 February 2009. During the session, the parties confirmed that they did not have any objections to the proper constitution of the Committee and that its members had been validly appointed in accordance with the arbitration agreement, the ICSID Convention and the ICSID Rules of Procedure for Arbitration Proceedings ('the Arbitration Rules'). During the session the parties also agreed on a number of procedural matters reflected in the minutes signed by the President and the Secretary of the Committee. In particular, these matters concerned: i) the representation of the parties; ii) the advance payments to the Centre; iii) the fees and expenses of the Committee Members; iv) the applicable Arbitration Rules; v) the place of proceedings; vi) the procedural language; vii) the records of the hearings; viii) the means of communication and copies of instruments; xix) the presence and quorum for

meetings of the Committee; x) the decisions of the Committee by correspondence; xi) the delegation of power to the President of the Committee to fix time limits; xii) the written and oral phases of the proceeding; xiii) number, sequence and schedule of written pleadings; xiv) scheduling of a pre-hearing conference; xv) the production of evidence and witnesses' testimony; xvi) the dates and nature of subsequent hearings; xvii) publication of decisions related to the proceeding.

5.  Helnan's Memorial on its Application for Annulment ('Memorial') was filed on 21 April 2009.  Egypt's Counter-Memorial ('Counter-Memorial') was filed on 22 June 2009.  Helnan's Reply Memorial ('Reply') was filed on 22 July 2009 and Egypt's Rejoinder ('Rejoinder') was filed on 13 August 2009.  A Hearing was held in the Peace Palace at The Hague on 19 October 2009.

## II.    BACKGROUND

6.  The dispute addressed in the Award concerned Helnan's eviction from the management of the Shepheard Hotel in Cairo ('the Hotel'), following:

(a) a decision on the part of the Ministry of Tourism to downgrade the Hotel's classification from the five star status required under Helnan's long-term Management Contract ('the Management Contract') with the Egyptian Organisation for Tourism and Hotels ('EGOTH'); and,

(b) an award of 20 December 2004 by an arbitral tribunal appointed under the *aegis* of the Cairo Regional Centre for International Commercial Arbitration to decide the contractual dispute between Helnan and EGOTH ('the Cairo Arbitration').

That latter award, in the making of which appointees of the parties took part, unanimously terminated the Management Contract on the ground that it was impossible to execute, and that both parties were responsible for failing to execute the contract. The tribunal awarded a sum to Helnan in settlement of debts, which Helnan encashed. The Cairo tribunal did not consider any claims for breach of treaty, no such claims having been submitted to it.

7. During the ICSID arbitration proceeding, the Tribunal decided that it had jurisdiction over Helnan's claims, and that those claims were admissible. However, it dismissed all of Helnan's claims on the merits.

8. Helnan now seeks annulment of the ICSID Award, invoking three grounds specified under Article 52(1) of the ICSID Convention: (e) that the award has failed to state the reasons on which it is based; (b) that the tribunal has manifestly exceeded its powers and (d) that there has been a serious departure from a fundamental rule of procedure. It challenges four findings made in the Award as meriting annulment:

   (a) the finding that Egypt's plan to terminate the Management Contract cannot constitute a treaty violation;

   (b) the finding that all Helnan's claims are disqualified because it did not challenge the downgrade in the Egyptian courts;

   (c) the finding that conduct of EGOTH and Ministry of Tourism officials did not go beyond contractual matters and commercial motivation; and,

   (d) the finding that Helnan's claims fail due to lack of legal causality.[1]

9. For the reasons set out below, arguments (a), (c) and (d) do not justify annulment of the Award. The position is different in relation to argument (b) (failure to challenge the decision in the Egyptian courts). The Tribunal's finding on this issue (principally found in the Award at paragraph 148) was a manifest excess of its powers. An ICSID tribunal may not decline to make a finding of breach of treaty on the ground that the investor ought to have pursued local remedies or otherwise validated the substance of its claims by recourse to the courts of the host State. Although this part of the Award must be annulled, it was not essential to the Tribunal's decision to dismiss Helnan's claims. Therefore, there is no ground to set aside the Tribunal's decision on the merits of the dispute as provided in operative paragraphs 169 and 170 of the Award.

---

[1] Memorial, Part V.

10. This Decision sets out the reasons for this conclusion, taking each of the impugned bases of the Tribunal's Award in turn, and summarizing the parties' respective submissions, followed by the Committee's evaluation of them.

### III.   TREATY CONSEQUENCES OF PLAN TO TERMINATE THE MANAGEMENT CONTRACT

### (a)   *Helnan's case*

11. Helnan seeks annulment of the Award on the ground that the Tribunal characterized the inspection of the Hotel on 4 September 2003 as 'a semblance, conceived as a mere formality deprived of any substance, and part of the implementation of an already taken decision to immediately downgrade the Shepheard Hotel'.[2]   The Tribunal found the circumstances of the September inspection to be 'very suspicious'.[3] Nevertheless the Tribunal held that Egypt had not breached its treaty obligations, relying for this purpose on the June 2003 inspection.[4] The Tribunal held that :

> [T]his does not necessarily lead to the conclusion that because of this suspicious inspection and the following downgrade, Egypt is responsible for breaches of the Treaty provisions. It must be recognized that the decision to downgrade the hotel could as well have been taken after the 14 June 2003 inspection, as suggested by the subsequent Memorandum submitted to the Minister of Tourism… This was not done and, instead, the Egyptian administration decided that it had to organise a semblance of an inspection to produce a report which reached the same result as the June report.   The Tribunal cannot ignore that after the 28 June letter of the Ministry of Tourism, Helnan never seriously challenged the conclusions in favour of the downgrading of the hotel.   Its main line of argument was to put the responsibility on EGOTH.   As already pointed out, the allocation of the responsibility for the downgrading was of a contractual nature outside the scope of jurisdiction of this Arbitral Tribunal. Under these circumstances, the downgrading as such cannot amount to a breach of Egypt's obligations under the Treaty, even if the procedure followed was rather suspicious.[5]

---

[2] Award, paragraph 154.
[3] Award, paragraph 144.
[4] Memorial, paragraph 99, citing the Award, paragraph 147.
[5]   Award, paragraph 148.

12. Helnan contends that the foregoing holding was a serious departure from a fundamental rule of procedure, since the legal status and consequences of the June 2003 inspection was not an issue submitted by either party for decision.[6]  A tribunal is not entitled to adjudge a dispute on a ground not argued by either of the parties. Second, the Tribunal failed to state the reasons on which its conclusion in this respect was based; its reasoning in this respect being inconsistent and contradictory.[7] Third, the Tribunal manifestly exceeded its powers. Helnan relies in this respect on the foregoing points. It also submits that the Tribunal exceeded its powers by applying Egyptian law rather than international law as an excuse for non-compliance with the Treaty.[8] Helnan criticises in this respect the Tribunal's reliance on the June 2003 Memorandum of the Ministry of Tourism[9] as an instrument of Egyptian law, contending that it should instead have considered and applied the treaty standard.[10]

### (b) Egypt's Reply

13. Egypt replies to Helnan's arguments by submitting that in fact the Tribunal's reflections on the September inspection were superfluous, since it had already legitimately found that grounds existed for the downgrade following the June inspection.[11] Egypt's approach in organising the September inspection was unsurprising since *'[c]ountless parties around the world every day consider how they might put their co-contractants formally in breach when they are confident that material grounds therefore are extant'.*[12] It argues that Helnan's submission on failure to be heard on the import of the June inspection mistakes the nature of the Award's findings. The Award did not find that the June inspection was itself a breach of the Treaty.  It rather held that Helnan's loss of the Management Contract resulted from the contractual termination ordered in the Cairo Arbitration.[13]

---

[6]  Memorial, paragraphs 99–111.
[7]  Memorial, paragraphs 112–123 and the Transcript of the Hearing of 19 October 2009 ('Transcript'), pp. 41/15–43/18.
[8]  *Ibid.,* paragraphs 124–138.
[9]  Exhibit R-18-K.
[10] Transcript, pp. 43/19 – 44/9.
[11] Counter-Memorial, paragraph 25(c).
[12] *Ibid.,* paragraph 25(f).
[13] *Ibid.,* paragraph 30.

*(c)      The Tribunal's Approach*

14. The Tribunal dealt with the relationship between the June and September inspections in the following way in its Award:

(a) It observed that the essence of Helnan's claim was that Egypt had orchestrated a series of events which ultimately led to Helnan's eviction from the Hotel, because Egypt considered that the Management Contract was an obstacle to the privatisation of the Hotel. Both the June and September inspections were alleged by Helnan to be part of that single strategy. As a result of it, Helnan claimed that its investment had been expropriated and that it had been treated unfairly and inequitably.

(b) As to the June inspection itself, the Tribunal recorded Helnan's observation that this inspection did not follow customary practice. But the Tribunal also found that the inspection had concluded that the Hotel was not of a five star standard. This finding was not challenged by Helnan at the time – a fact that was unsurprising since the problems with the Hotel had persisted for some years, there being an outstanding and longstanding dispute between Helnan and EGOTH  as to which of them was financially responsible for the investments required to upgrade and maintain the Hotel at a five-star standard.  Given this broader context, the June inspection did not violate the principle of fair and equitable treatment.[14]

(c) Against this background, the September inspection was a 'mere formality,' since the decision to downgrade could have been taken after the June inspection. Helnan never challenged the substantive findings of the June inspection, since its real dispute was a contractual one – that EGOTH and not Helnan had financial responsibility for the necessary works.[15]

*(d)      The Committee's Analysis*

15. Helnan's argument takes the June inspection out of the context in which the issue arose for decision and was decided by the Tribunal.  Helnan invited the Tribunal to consider the June inspection as part of its narrative of complaint as to an

---

[14] Award, paragraphs 138-143.
[15] Award, paragraphs 144–147

orchestrated campaign by Egypt to evict Helnan from the Hotel. It figures as part of Helnan's allegation of an orchestrated 2003 inspection and downgrade in its Memorial on the Merits (paragraphs 119-121). In Helnan's Post-Hearing Memorial, the June and September inspections are dealt with collectively under the heading: 'The Summer 2003 Inspections and Downgrade Breached Egypt's Treaty Obligations' (paragraphs 68–79). After devoting some ten paragraphs to the June inspection and report, Helnan then adds a section under the heading: 'The September Inspection *Also* Did Not Conform To Standard Procedure.' (emphasis added).

16. Thus, Helnan correctly accepted before the *ad hoc* Committee that the parties did refer to the June inspection in their arguments.[16] But the June inspection evidently played a role in Helnan's submissions which went beyond it being merely part of a sequence of facts which led ultimately to the September inspection. Rather, the June inspection was itself part of Helnan's claim of unfair and inequitable treatment.

17. Egypt, for its part, denied that the downgrade was collusive, claiming instead that it was 'the culmination of a long series of inspectoral condemnations stretching over several years'.[17]  Helnan's objections to the June and September 2003 reports and the alleged failure to provide a reasonable opportunity to cure the violations referred to in them was 'self-defeating because the 2003 reports basically reiterate violations already reported in previous years'.[18]

18. The Report on the June inspection of the Hotel, which was part of the evidence before the Tribunal[19] concludes at paras. 3(d)–(e):

> (d)    The management of the hotel previously received a notice and it was notified several times with remarks in order to act accordingly. However, the management of the hotel does not respond and does not observe such remarks. *Consequently, the hotel will be downgraded to Four Stars….*

---

[16] Transcript, pp. 46/18–47/17.
[17] Respondent's Counter-Memorial on the Merits, 9 June 2007, paragraph 73.
[18] *Ibid,* paragraph 88.
[19] Exhibit R-18-K.

> (e)      Because the hotel is owned by the State (Egoth Company)
> and because there was a contract between the owning company and
> the management company, we suppose the following:
>
> To consider the hotel position with the owning company before
> imposing penalties (by downgrading its class), so that such penalties
> are not used for the benefit of one of the parties in such a manner as
> to adversely impact the public interest. (emphasis added.)

19. Helnan devoted extensive evidence and submissions to rebutting this element of
    Egypt's defence, arguing that the July and September 2003 reports were different
    in kind from those rendered in 2000[20] and further contending that the Hotel was
    of a five-star standard.[21]

20. It is no part of the function of an annulment committee to reconsider findings of
    fact made by an ICSID arbitral tribunal. Rather the issues for this Committee are
    circumscribed by the terms of Article 52(1) of the ICSID Convention and relate to
    the Tribunal itself: its powers; its process; and the reasoning of its Award.

21. The above exposition demonstrates that the June 2003 inspection and report was
    the subject of detailed submissions and evidence, because Helnan had included
    it as part of its complaint of failure to provide fair and equitable treatment under
    the Treaty.

22. Each of the parties presented a very different theory to the Tribunal as to the
    significance of the June inspection. For Helnan, it was another instance of its
    allegation of Egypt's orchestrated campaign to oust it from the Hotel in order to
    prepare for privatisation. For Egypt, it was merely confirmatory of the inadequate
    standard of the Hotel, which was the subject of an ongoing and unresolved
    contractual dispute between Helnan and EGOTH.

23. The task for the Tribunal was thus to decide upon its own interpretation of the
    significance of factual events in order to decide the claims of breach of Treaty
    before it. In this context, the observations of the *ad hoc* committee in the first
    decision on annulment in *Vivendi v. Argentina*[22], paragraphs 84–85, are apposite:

---

[20] Helnan's Post-Hearing Memorial, 26 November 2007, ('Helnan's Post-Hearing Memorial'), paragraphs 101–109.
[21] *Ibid*, paragraphs 91–100.
[22] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic* (ICSID Case No. ARB/97/3), First Decision on Annulment, 3 July 2002 (ICSID Case No. ARB/97/3) ('*Vivendi v. Argentina*'), 6 ICSID Rep 328.

> It may be true that the particular approach adopted by the Tribunal in attempting to reconcile the various conflicting elements of the case before it came as a surprise to the parties, or at least to some of them. But even if true, this would by no means be unprecedented in judicial decision-making, either international or domestic....
>
> From the record, it is evident that the parties had a full and fair opportunity to be heard at every stage of the proceedings. They had ample opportunity to consider and present written and oral submissions on the issues, and the oral hearing itself was meticulously conducted to enable each party to present its point of view. The Tribunal's analysis of the issues was clearly based on the materials presented by the parties and was in no sense *ultra petita*.

24. In the present case, the June inspection was plainly within the ambit of the dispute. Indeed, it was central to each party's larger case. As a consequence, the Tribunal cannot be said to have exceeded its powers in giving dispositive weight to its interpretation of the evidence presented. Nor did it fail to afford the parties an opportunity to present their case.

25. The Tribunal was obliged to reach a view as to whether it accepted Helnan's claim or Egypt's defence in this respect. In summary, it rejected Helnan's claim of an orchestrated campaign. Instead, it accepted Egypt's defence that the Hotel had for long failed to reach a five-star standard, in view of the contractual dispute between EGOTH as owner and Helnan as manager over which of them bore financial responsibility for investing in the Hotel's maintenance.

26. In explaining why it came to that view, the Tribunal was not obliged simply to choose *en bloc* between each of the rival theories and the evidence in support of them adduced by the parties. It was itself 'the judge' of the probative value of any evidence adduced: ICSID Arbitration Rule 34(1). It was therefore entitled to reach the view, relying as it expressly did[23] on the June Inspection Report, that the September 2003 was a mere formality, because it was already clear in June that the Hotel did not meet five-star standard and should be downgraded.

---

[23] Award, paragraph 147.

27. This was not a matter of applying Egyptian law to a question of international law. It was simply a matter of determining on the evidence which of the two rival arguments as to the overall significance of the summer 2003 inspections should be preferred. The Tribunal is not to be faulted for reaching its own conclusions as to the correct interpretation and significance of the evidence before it.

## IV. EFFECT OF FAILURE TO CHALLENGE THE DOWNGRADE IN THE EGYPTIAN COURTS

### (a)    Helnan's case

28. Helnan seeks annulment of the finding in paragraph 148 of the Award that:

> The ministerial decision to downgrade the hotel, not challenged in the Egyptian administrative courts, cannot be seen as a breach of the Treaty by EGYPT. It needs more to become an international delict for which EGYPT would be held responsible under the Treaty.

29. Helnan alleges that this finding is unsupported by reasons; fails to mention its pleadings and therefore seriously departs from a fundamental rule of procedure; and fails to apply the relevant Treaty standard to the measures, thereby manifestly exceeding the Tribunal's powers.[24]

30. Helnan pleads that the impugned paragraph in the Award fails to explain why if, as both parties accepted, and as the Tribunal records, there is no requirement to exhaust local remedies, Helnan was nevertheless obliged, in order to have a valid treaty claim, to challenge the Ministerial decision before the Egyptian administrative courts.[25] It submits that the Tribunal does not give reasons to explain why the sole legal authority which it relied upon for its proposition (*Generation Ukraine Inc v. Ukraine*[26]) was applicable to the instant case, when on a proper analysis it was not.[27] Helnan submits that, by failing to refer to Helnan's submissions on the point (contained in its Post-Hearing Memorial, paragraphs 321–342) the Tribunal failed to observe the fundamental rule of procedure requiring each party to have an opportunity to present its case, which must include the reasonable consideration by the tribunal of the party's arguments.

---

[24] Memorial, paragraph 140; Transcript, pp. 50/6–55/11
[25] *Ibid*, paragraph 144.
[26] *Generation Ukraine v. Ukraine* (ICSID Case No. ARB/00/9), Award, September 16, 2003, ('*Generation Ukraine v. Ukraine*') 10 ICSID Rep 236
[27] Memorial, paragraphs 146–157.

31. Finally, Helnan submits that the Tribunal's failure to apply the clear provisions of the applicable law (the BIT and the ICSID Convention) in imposing such a requirement on Helnan constituted a manifest excess of power.[28]  Citing the First Decision on Annulment in *Vivendi v. Argentina,* paragraph 102, Helnan submits that:

> [I]t is not open to an ICSID tribunal having jurisdiction under a BIT in respect of a claim based upon a substantive provision of that BIT, to dismiss the claim on the ground that it could or should have been dealt with by a national court.

### *(b)*  **Egypt's Reply**

32. Egypt replies that this point was merely confirmatory rather than decisive in the Tribunal's reasoning.[29] The duty to give reasons does not, in its submission, require the Tribunal to give express consideration in its Award to Helnan's arguments. Helnan was heard on the point, even if its arguments did not ultimately persuade the Tribunal.

33. In its oral pleading before the *ad hoc* Committee, Egypt developed its explanation of the Tribunal's approach on this point.[30] It submitted that the Tribunal was entitled to reject the investor's complaints of unfair and inequitable treatment if it had not resorted to the local courts as the obvious form of recourse for a disputed downgrading of the hotel.[31] Such a finding went to the materiality of the investor's complaint – whether it could amount to a breach of the international obligation if no step had been taken locally to correct the act of maladministration.[32] In any event, such a finding by the Tribunal was not reviewable on annulment.

### *(c)*  *The Committee's Analysis*

34. Paragraph 148 of the Award (and the subsequent repetition of the same point at paragraphs 159 and 162) raises a question of importance to the arbitration of investment treaty claims under the ICSID Convention, namely the extent to which

---

[28] Memorial, paragraphs 160–165
[29] Counter-Memorial, paragraph 30.
[30] Transcript, pp. 93/10–16, pp. 106/10–122/5
[31] *Ibid.,* pp. 106/17-107/6, pp. 114/5–115/2
[32] *Ibid.,* 117/6–119/17

an investor may be required, *as a matter of substance rather than jurisdiction*, to pursue local remedies in order to sustain a valid claim for breach of treaty.

35. In the context of the present annulment application, Helnan's objections that there has been a failure to give reasons and failure to observe a fundamental rule of procedure are not persuasive.

36. Article 52(1)(e) of the ICSID Convention permits annulment on the ground 'that the award has failed to state the reasons on which *it* is based.' (emphasis added). Thus, the object of this ground is the reasoning which leads to the Tribunal's Award.[33] It does not permit annulment simply because the tribunal has not deemed it necessary to discuss every argument raised by one of the parties.[34]

37. In the light of this standard, paragraph 148 of the Award does enable the reader to follow the process of the Tribunal's reasoning. The paragraph may not deal with every contrary argument raised by Helnan. It may not resolve every further question which the Tribunal's formulation raises. But the factor which the Tribunal regarded as germane to its reasoning is clear enough, as is the legal basis and authority upon which it relied.

38. By the same token, there was no failure to observe a fundamental rule of procedure in this regard. Although Egypt did not apparently raise the point until its Rejoinder,[35] Helnan was afforded an opportunity to advance its arguments on the point, both at the Hearing[36] and in its written Post-Hearing Memorial[37]. Its arguments were plainly considered by the Tribunal. They are summarised in the Award at paragraphs 87–88. The right to be heard does not require a tribunal to consider *seriatim* and evaluate expressly in its award every argument raised by each party. Helnan's essential submissions on this point were heard by the Tribunal, but they were rejected in favour of those advanced by Egypt.

---

[33] *Maritime International Nominees Establishment (MINE) v. Republic of Guinea* (ICSID Case No. ARB/84/4), Decision on Annulment, 22 December 1989, ('*MINE v. Guinea*') 4 ICSID Rep 79, paragraph 5.08 cf. the same approach taken by the International Court of Justice ('ICJ') in *Case Concerning the Arbitral Award made by the King of Spain on 23 December 1906 (Honduras v. Nicaragua)* [1960] ICJ Rep 192, 216, 30 ILR 457, 476.

[34] The analysis of Professor W. Michael Reisman 'The Breakdown of the Control Mechanism in ICSID Arbitration' [1989] Duke L R 739, 791, to the effect that the requirements of Article 48(3) of the Convention are not to be carried into Article 52(1)(e) is accepted by this Committee as correct. The earlier contrary position of the *ad hoc* committee in *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Camerounaise des Engrais* (ICSID Case No. ARB/81/2), First Decision on Annulment, 3 May 1985, ('*Klöckner v. Cameroon*') 2 ICSID Rep 95, paragraph 115, is in this Committee's view untenable.

[35] Rejoinder, paragraphs 45–46. Confirmed by counsel for Egypt at the annulment hearing: Transcript, pp. 121/9 – 122/4.

[36] Hearing Transcript, October 8, 2007, pp. 17/8–21/16.

[37] Helnan's Post-Hearing Memorial, paragraphs 320–342.

39. However, the rejection of each of these grounds for annulment does not dispose of this issue. It leaves the question whether the Tribunal's finding in paragraph 148, in reliance on a passage of the Award in *Generation Ukraine,* constituted a manifest excess of its powers.

40. The question whether an ICSID arbitral tribunal has exceeded its powers is determined by reference to the agreement of the parties. It is that agreement or *compromis* from which the tribunal's powers flow*,* and which accordingly determines the extent of those powers. In the case of an investment treaty claim, this agreement is constituted by the BIT and by the ICSID Convention (which the agreement to arbitrate incorporates by reference) as well as by the filing of the investor's claim. Read together, these three elements constitute the arbitration agreement and therefore prescribe the parameters of the Tribunal's powers.[38] As the International Law Commission put it in formulating its seminal Draft Rules on Arbitral Procedure, from which Article 52 was derived:

> The question of excess of power or jurisdiction is, in essence, a question of treaty interpretation. It is a question which is to be answered by a careful comparison of the award or other contested action by the tribunal with the relevant provisions of the *compromis.* A departure from the terms of submission or excess of jurisdiction should be clear and substantial and not doubtful and frivolous.[39]

41. The concept of the 'powers' of a tribunal goes further than its jurisdiction, and refers to the scope of the task which the parties have charged the tribunal to perform in discharge of its mandate, and the manner in which the parties have agreed that task is to be performed. That is why, for example, a failure to apply the law chosen by the parties (but not a misapplication of it) was accepted by the Contracting States of the ICSID Convention to be an excess of powers,[40] a point also accepted by annulment committees.[41] Further, a failure to decide a question entrusted to the tribunal also constitutes an excess of powers, since the tribunal

---

[38] Accord Christoph Schreuer *et al., The ICSID Convention: A Commentary* (2 ed., 2009) p. 938.
[39] International Law Commission, 'Commentary on the Draft Convention on Arbitral Procedure' UN Doc A/CN.4/92, 108.
[40] *History of the Convention,* Documents Concerning the Origin and the Formulation of the Convention, Vol II, Part 1, p. 518.
[41] *E.g. Hussein Nuaman Soufraki v. United Arab Emirates* (ICSID Case No. ARB/02/7) (Decision on Annulment), June 5, 2007, ('*Soufraki v. UAE*'), paragraph 85.

has also in that event failed to fulfil the mandate entrusted to it by virtue of the parties' agreement.[42]

42. By virtue of Article 9 of the BIT in the present case, the parties agree to submit '[a]ny dispute which may arise between an investor of one Contracting Party and the other Contracting Party in connection with an investment' to international arbitration, *inter alia*, under the ICSID Convention. Article 9 does not refer such disputes to host state courts.

43. The parties having chosen arbitration under the ICSID Convention pursuant to Article 9 of the BIT, the jurisdiction of the Centre is determined under Chapter II of the ICSID Convention (Articles 25-27) Article 26 within that Chapter expressly provides:

> Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy. A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention.

44. The Report of the Executive Directors of the World Bank on the Convention explains the purpose of this provision in paragraph 32 as follows:

> **Arbitration as an Exclusive Remedy**
>
> It may be presumed that when a State and an investor agree to have recourse to arbitration, and do not reserve the right to have recourse to other remedies or require the prior exhaustion of other remedies, the intention of the parties is to have recourse to arbitration to the exclusion of any other remedy. This rule of interpretation is embodied in the first sentence of Article 26. In order to make clear that it was not intended thereby to modify the rules of international law regarding the exhaustion of local remedies, the second sentence explicitly recognizes the right of a State to require the prior exhaustion of local remedies.

45. Thus, by Article 26, the Contracting States agreed upon a fundamental reversal of the local remedies rule as it applies in customary international law, unless the relevant State expressly imposed such a condition. Article 26 represents one of

---

[42] *Ibid* paragraph 44; *Vivendi v. Argentina* paragraph 86.

the singular progressive advantages of the ICSID Convention. It 'create[s] a rule of priority *vis-à-vis* other systems of adjudication in order to avoid contradictory decisions and to the preserve the principle of *ne bis in idem*.'[43] Article 26 operates as a key element of the parties' agreement to arbitrate – confirming the exclusivity of ICSID arbitration as the means of dispute resolution, where the parties have agreed to that forum for the resolution of their dispute.

46. The Tribunal accepts in paragraph 148 of its Award that there was no requirement for Helnan to exhaust local remedies before starting the arbitration. But it then proceeds, relying on a passage in *Generation Ukraine,* to find as a matter of substance that the failure of Helnan to challenge the Ministerial decision in the administrative courts means that that decision 'cannot be seen as a breach of Treaty.'

47. The problem with the Tribunal's reasoning is that this is to do by the back door that which the Convention expressly excludes by the front door. Many national legal systems possess highly developed remedies of judicial review. Yet it would empty the development of investment arbitration of much of its force and effect, if, despite a clear intention of States parties not to require the pursuit of local remedies as a pre-condition to arbitration, such a requirement were to be read back in as part of the substantive cause of action.

48. In numerous ICSID cases, tribunals have rendered awards in favour of the claimants as a result of administrative decisions, in which no such application to the local courts had been made. Of course, a claimant's prospects of success in pursuing a treaty claim based on the decision of an inferior official or court, which had not been challenged through an available appeal process, should be lower, since the tribunal must in any event be satisfied that the failure is one which displays insufficiency in the system, justifying international intervention. But that is a very different matter to imposing a requirement on the claimant to pursue local remedies before there can be said to have been a failure to provide fair and equitable treatment.

---

[43] Schreuer, *supra* note38, 381. Where a State has agreed with a foreign investor that arbitration of disputes arising under a contract between them shall be the exclusive remedy, the exhaustion of local remedies is inferentially excluded. It was so argued in four cases before the Permanent Court of International Justice and the International Court of Justice, but settlements (or finding of lack of jurisdiction) supervened. See *Losinger & Co., PCIJ, Series C, No. 78,* pp. 7-8, *ff.* ; *Anglo-Iranian Oil Company Case, ICJ Pleadings,* pp. 18-19, 122-123, 288, 291; *Électricité de Beyrouth Company Case, ICJ Pleadings,* pp. 14, 58; *Compagnie du Port, des Quais and des Entrepôts de Beyrouth, ICJ Pleadings,* pp. 9 39, 67, 70, 89, 91-923. See also, Stephen M. Schwebel and J. Gillis Wetter, 'Arbitration and the Exhaustion of Local Remedies' (1966) 60 AJIL 484.

49. In the light of these precedents and considerations, the Award in *Generation Ukraine* – at any rate, as applied in these proceedings -- stands somewhat outside the *jurisprudence constante* under the ICSID Convention in the review of administrative decision-making for failure to provide fair and equitable treatment. On its facts, the decision of the tribunal in that case is understandable. The impugned decision was that of an inferior official in the Kyiv City State Administration in omitting to grant a lease agreement and construction permit, which it was alleged amounted to expropriation.[44] In these circumstances, it is unsurprising that the tribunal in *Generation Ukraine* should observe that:

> Yet again, it is not enough for an investor to seize upon an act of maladministration, no matter how low the level of the relevant governmental authority; to abandon his investment without any effort at overturning the administrative fault; and thus to claim an international delict on the theory that there had been an uncompensated virtual expropriation. In such instances, an international tribunal may deem that the failure to seek redress from national authorities disqualifies the international claim, not because there is a requirement of *exhaustion* of local remedies but because the very reality of conduct tantamount to expropriation is doubtful in the absence of a *reasonable* – not necessarily exhaustive - effort by the investor to obtain correction.[45]

50. But it does not at all follow from this conclusion that, in order to succeed in a claim of failure to provide fair and equitable treatment based upon a *Ministerial* decision, the investor must challenge that decision in the local administrative courts. To be sure, the Treaty standard of fair and equitable treatment is concerned with consideration of the overall process of the State's decision-making. A single aberrant decision of a low-level official is unlikely to breach the standard unless the investor can demonstrate that it was part of a pattern of state conduct applicable to the case or that the investor took steps within the administration to achieve redress and was rebuffed in a way which compounded, rather than cured, the unfair treatment.

---

[44] *Generation Ukraine v. Ukraine,* paragraphs 20.27–20.33.
[45] *Ibid.,* paragraph 20.30.

51. But it is an entirely different matter to impose upon an investor, as a condition 'to become an international delict for which [the Contracting State] would be held responsible under the Treaty,'[46] a requirement that the decision of a Government Minister, taken at the end of an administrative process, must in turn be challenged in the local courts. Such a decision is one for which the State is undoubtedly responsible at international law, in the event that it breaches the international obligations of the State.[47] Moreover, the characterisation of such an act as unlawful under international law is not affected by its characterisation as lawful under internal law.[48] Thus a decision by a municipal court that the Minister's decision was lawful (a judgment which such a court could only reach applying its own municipal administrative law) could not preclude the international tribunal from coming to another conclusion applying international law.

52. The consequences of the adoption of the approach of the Tribunal in question in investment treaty law could be serious. It would inject an unacceptable level of uncertainty into the way in which an investor ought to proceed when faced with a decision on behalf of the Executive of the State, replacing the clear rule of the Convention which permits resort to arbitration. As Schreuer has rightly observed:

> Once it is accepted that the investor should make an attempt at local remedies it is only a small step to require that the attempt should not stop at the level of the lowest court. Once we require that reasonable appeals be taken we are close to demanding that these be exhaustive.[49]

53. A requirement to pursue local court remedies would have the effect of disentitling a claimant from pursuing its direct treaty claim for failure by the Executive to afford fair and equitable treatment, even where the decision was taken at the highest level of government within the host State. It would leave the investor only with a complaint of unfair treatment based upon denial of justice in the event that the process of judicial review of the Ministerial decision was itself unfair. Such a consequence would be contrary to the express provisions of Article 26, incorporated into the parties' *compromis,* since it would have the effect of

---

[46] Award, paragraph 48.
[47] Art 4, International Law Commission, Draft Articles on the Responsibility of States for Internationally Wrongful Acts 2001.
[48] *Ibid.,* Art 3.
[49] Schreuer 'Calvo's Grandchildren: the Return of Local Remedies in Investment Arbitration' (2005) 4 LPICT 1, 15.

substituting another remedy for that provided under the BIT and the ICSID Convention.

54. Such a requirement would also have the effect of leading to the dismissal of claims precisely on the ground that they should have been submitted to a national court. It was the unjustified imposition of such a requirement which led to the annulment of the first Award in *Vivendi v. Argentina,* cited above.

55. In order to annul this part of the Award, the *ad hoc* Committee must of course be satisfied that the Tribunal's excess of powers is manifest. This means that the excess must be obvious or clear. An *ad hoc* committee will not annul an award if the Tribunal's disposition is tenable, even if the committee considers that it is incorrect as a matter of law.[50] But in the present case, the requirements of the parties as to the powers of the Tribunal in this respect are manifest. They are stated in the plain words of Article 9 of the BIT and Article 26 of the ICSID Convention, being provisions which confer jurisdiction upon the Tribunal, and thus describe the mandate or powers conferred upon the Tribunal by the agreement of the parties. Accordingly, in failing to observe those clear requirements, the Tribunal has manifestly exceeded its powers within the terms of Article 52(1)(b) of the ICSID Convention.

56. An *ad hoc* committee is expressly empowered to annul any part of an Award on the grounds specified in Article 52(1) by virtue of Article 52(3), a power which Committees have used in other annulment applications.[51] The consequence of such a finding is that 'severable parts of an award which are not themselves annulled will stand.'[52]

57. In the instant case, it is clear from the text of the Award that the *ratio* of the Tribunal's decision was that the allocation of responsibility for the downgrading of the Hotel was a contractual matter and, as a result, Egypt's actions in this regard could not amount to a breach of Treaty.[53] The impugned passage at paragraph 148 opens with the word '[m]oreover', which, as Egypt correctly observed in its

---

[50] *Klöckner v. Cameroon*, paragraph 52; and see, to like effect, *Case concerning the Arbitral Award of 31 July 1989 (Guinea-Bissau v. Senegal)* ICJ Rep. 1991, 53, paragraphs 47–48; *Government of Sudan v. Sudan People's Liberation Movement/ Army (the 'Abyei' arbitration)* (PCA, 22 July 2009), paragraphs 508–510.
[51] See, *e.g.*, *CMS Gas Transmission Company v. Argentine Republic* (ICSID Case No. ARB/01/8), Decision on Annulment, 25 September 2007 ('*CMS v. Argentina*').
[52] *Ibid.*, paragraph 99; *Vivendi v. Argentina*, paragraph 68.
[53] Award, paragraph 147

submissions, demonstrated that the paragraph was merely confirmatory not decisive. In these circumstances, the annulment of the Tribunal's finding in paragraph 148 can have no effect on the rest of the Award, including the dismissal of the Claimant's claims in paragraph 3 of the *dispositif*, which must continue to stand.

## V.  CHARACTERISATION OF THE DISPUTE AS CONTRACTUAL IN NATURE

### (a)  *Helnan's Case*

58. The third element of the Award which Helnan alleges gives rise to an annullable error is the Tribunal's finding in paragraphs 152-157 and 160–161 that underlying cause of the claim was EGOTH's plan (in which Ministry of Tourism officials participated) to terminate the Management Contract, which did not give rise to a treaty breach by Egypt.

59. Helnan objects that the Tribunal's reasoning is internally contradictory. The rules of state responsibility at international law are held applicable by the Tribunal at the jurisdictional stage, yet supplanted by a rule requiring governmental rather than contractual conduct when determining a treaty breach.[54] The reasoning of the Tribunal as to the involvement of Ministry of Tourism officials is particularly contradictory, since the Award at once accepts that such officials were involved in the implementation of the plan, but at the same time concludes that this involvement is not sufficient to entail a breach of treaty.[55]

60. Helnan further objects that it was denied the right to be heard because the Tribunal wrongly restricted the scope of the case advanced by Helnan against Egypt, requiring it to prove that the plan had been engineered in order to enable Egypt to privatise the Hotel, whereas Helnan had in fact advanced a much broader claim of breach of treaty.

61. Thirdly, Helnan claims that the Tribunal manifestly exceeded its powers by failing to apply the applicable law, and specifically the law of state responsibility in the

---

[54] Memorial, paragraphs 174–178.
[55] *Ibid*, paragraphs 179–182.

interpretation of the Treaty, imposing instead a requirement of 'commercial motivation' which led it to abdicate its jurisdiction.[56]

### (b)      Egypt's Reply

62. Egypt replies that the Tribunal simply found that Egypt committed no breach of treaty. That is what a fair reading of paragraphs 152, 157 and concluding at paragraph 169 confirms.[57] The Tribunal's findings that the dispute was in essence a contractual dispute between EGOTH and Helnan, finally resolved by the Cairo arbitration, were made in the context of explaining why the termination of the Management Contract and Helnan's eviction from the Hotel was not a breach of Treaty. In any event, even if the Tribunal could be shown to have been in error as to this, it could not amount to an annullable error under Article 52.[58]

### (c)      The Committee's Analysis

63. The finding of the Tribunal in this aspect of its Award, so far from giving rise to an annullable error, in fact appears to be an orthodox application of settled principle to the facts of the case. A comparison with the First Decision on Annulment in *Vivendi v. Argentina* is instructive. In that case, the *ad hoc* committee was critical of the tribunal's decision that it was impossible to make a finding of breach of treaty, given the extent to which the claims were founded upon the Concession Contract.[59] The *ad hoc* committee emphasised the difference between a contract cause of action and a treaty cause of action. It cited with approval the dictum in *Oppenheim* that:

> It is doubtful whether a breach by a state of its contractual obligations with aliens constitutes *per se* a breach of an international obligation, unless there is some such additional element as denial of justice, or expropriation, or breach of treaty, in which case it is that additional element which will constitute the basis for the state's international responsibility.[60]

---

[56] Memorial, paragraphs 195–99.
[57] Transcript pp. 94/18–106/8
[58] Counter-Memorial, paragraph 30.
[59] *Vivendi v. Argentina*, paragraph 110
[60] Jennings & Watts (eds) *Oppenheim's International Law* (9th ed, 1992) 927, cited in *ibid*, paragraph 110, fn 78.

It then observed:

> A treaty cause of action is not the same as a contractual cause of action; it requires a clear showing of conduct which is in the circumstances contrary to the relevant treaty standard. The availability of local courts ready and able to resolve specific issues independently may be a relevant circumstance in determining whether there has been a breach of international law (especially in relation to a standard such as that contained in Article 3 [fair and equitable treatment]). But it is not dispositive, and it does not preclude an international tribunal from considering the merits of the dispute. [61]

64. In the present case, the Tribunal did consider the merits of the dispute. It considered and adopted the distinction between breach of treaty and breach of contract.[62] It did make an express finding that Egypt was not in breach of treaty.[63] It was entitled to, and did, find that there was no such breach. Such a finding is not amenable to reconsideration on annulment. The Tribunal then found that the root cause of Helnan's eviction from the Hotel was not a breach of the BIT by Egypt, but rather a contractual dispute with EGOTH, which dispute was determined by the Cairo Arbitration.

65. None of this demonstrates any lack of coherence in reasoning. Nor does it represent a failure to hear Helnan's contrary arguments. Those submissions were heard, but were rejected on the merits in the Tribunal's determination on the applicable facts and law. The Tribunal's reference to, and reliance upon, the contractual dispute and its disposition does not represent any excess of power on the ground of failure to apply the applicable law. On the contrary, it was an essential part of the Tribunal's analysis of breach of treaty to decide whether the acts complained of 'individually nor collectively rose to the level of a breach of the BIT.'[64] It was entirely legitimate, indeed essential in the circumstances of the case, for the Tribunal to consider in that regard whether those acts were properly to be explained as simply as a contractual dispute, which is what it did.

66. Accordingly, this ground for annulment must be rejected.

---

[61] *Vivendi v. Argentina,* paragraph 112.
[62] Award, paragraphs 102–103.
[63] *Ibid,* paragraph 152.
[64] *Vivendi v. Argentina,* paragraph 113.

## VI.   LACK OF LEGAL CAUSALITY

### (a)   Helnan's Case

67. The fourth element in the Award to which Helnan objects is the Tribunal's finding that there was no 'legal causality' between the decision to downgrade the Hotel and the termination of the Management Contract, since the Cairo Arbitration terminated the Contract for reasons independent of the downgrade decision.[65] Helnan contends that '[o]n this point the Award is wrong, lacks reasons, and is produced by a manifest excess of power': Memorial, paragraph 202.

68. Helnan criticises the reasoning of the Tribunal on the ground that international law, as the applicable law, requires no causal link between the grounds triggering the Cairo arbitration and those relied upon by that tribunal. It requires simply conduct attributable to Egypt that was inconsistent with its obligations under the Treaty: *ibid.,* paragraphs 203–211. By the same token, Helnan claims that this finding constitutes a manifest excess of powers, since the Tribunal applied Egyptian law and not the applicable international law to the resolution of the issue.

### (b)   Egypt's Reply

69. Egypt replies that the Tribunal simply found that the dispute was resolved at a contractual level between EGOTH and Helnan by the Cairo Arbitration.[66] Thus, even if there had been a plan of the kind alleged by Helnan, it would have failed because the termination of the contract and the eviction was not caused by the downgrading, it was caused by the resolution of the contractual dispute by the Cairo arbitration, a process in which Helnan had participated. The Award in the Cairo Arbitration was *res judicata* between the parties to it as regards the contractual dispute. It was that Award which had led to the eviction of Helnan from the Hotel, and which also resulted in the payment by EGOTH to Helnan of the sum awarded by the arbitrators.[67]

---

[65] Award, paragraphs 150, 168; Memorial, paragraphs 200–202.
[66] Transcript, pp. 94/3-6
[67] Transcript, pp. 122/6–129/23

*(c)*      ***The Committee's Analysis***

70. This ground of objection is closely related to the previous ground. The Tribunal was entitled to, and did, come to the view that the real cause of the termination of the Management Contract and of Helnan's eviction from the Hotel was its contractual dispute with EGOTH. That dispute was finally resolved by the Cairo Arbitration.

71. In any event, the Tribunal's findings on that issue are matters of substance, which it forms no part of the function of an annulment committee to review under Article 52 of the ICSID Convention. Helnan cites no authority for its argument under this head, and no basis for objection under the specific heads of Article 52 can be discerned.

## VII.   EGYPT'S ALTERNATIVE PLEA

72. In view of the fact that the Award requires annulment only in respect of one part of the Tribunal's decision, which does not affect the *dispositif,* it is not necessary to rule upon Egypt's alternative plea seeking annulment of the Decision on Jurisdiction.

**VIII.    DECISION OF THE AD HOC COMMITTEE**

73. **For the foregoing reasons, the Committee DECIDES:**

(1)    To annul the holding of the Arbitral Tribunal in paragraphs 148 and 162 of its Award which, while disclaiming a requirement of exhaustion of local remedies before ICSID arbitral recourse may be implemented, nevertheless accepts that challenge by Helnan of the decision to terminate its Management Contract in competent Egyptian administrative courts was required in order to demonstrate the substantive validity of its claims.

(2)    To deny the claims of Helnan otherwise to annul the Arbitral Tribunal's Award of July 3, 2008.

(3)    To require the parties equally to share the costs and expenses of ICSID and the fees of the members of the *ad hoc* Committee, each party being left to meet the costs of its representation in the annulment proceedings.

**THE AD HOC COMMITTEE:**

*[Signed]*

_____

Bola A. Ajibola

Date:

*[Signed]*

_____

Campbell A. McLachlan

Date:

*[Signed]*

_____

Stephen M. Schwebel

Date: