UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

METSO MINERALS CANADA, INC. and
METSO MINERALS INDUSTRIES, INC.,

                Petitioners,

-against-

ARCELORMITTAL EXPLOITATION
MINIÉRE CANADA and ARCELORMITTAL
CANADA INC.,

                Respondents.



19 Civ. 3379 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    Petitioners Metso Minerals Canada, Inc. and Metso Minerals Industries, Inc. (together, "Metso") move to confirm a March 20, 2019, arbitration award (the "Award") against respondents ArcelorMittal Exploitation Miniére and ArcelorMittal Canada, Inc. (together, "ArcelorMittal"). (Notice of Motion to Confirm and Enforce Arbitral Award, dated Apr. 16, 2019 [dkt. no. 2]). ArcelorMittal cross-moves to vacate the Award on grounds that the arbitrators manifestly disregarded the law. (Cross-Petition to Vacate Arbitration Award ("Cross-Petition"), dated May 17, 2019 [dkt. no. 25]). For the reasons stated below, Metso's motion to confirm is GRANTED, and ArcelorMittal's cross-motion to vacate is DENIED.

1

I. Background[1]

The Award arises from a dispute regarding a contract for Metso to supply a specialized mill to a mining complex and iron plant ArcelorMittal operated in Quebec, Canada. (See Declaration of Michael Evan Jaffe ("Jaffe Decl."), dated Apr. 16, 2019 [dkt. no. 4], Ex. G ("Award") ¶¶ 171-74).

Around 2010, ArcelorMittal decided to expand its iron plant operations by purchasing a new mill, with the goal of increasing annual iron output by 8 million tons. (Id. ¶¶ 171-72, 175). In August 2010, ArcelorMittal requested quotations for the new mill from several bidders, including Metso. (Id. ¶¶ 171-72). Metso's bid ultimately won, and in February 2011, Metso and ArcelorMittal executed a contract for the mill. (Id. ¶ 172). The contract stated that its overarching objective was to expand the plant's iron production capacity by 8 million tons per year. (Id. ¶ 280). It also contained a clause requiring the parties to submit any disputes arising from the contract to arbitration under the Arbitration Rules for the International Chamber of Commerce ("ICC"). (Id. ¶ 1).

Over a year after the parties executed the contract, Metso delivered the new mill to ArcelorMittal's mining complex. (Id. ¶ 189). Following a ramp-up period, it became clear that

---

[1] The following facts are taken from the Award and the parties' submissions and are not disputed except where noted.

2

the mill was underperforming. (Id. ¶ 190). ArcelorMittal notified Metso of the problem, and Metso responded with a remedial action plan, but the corrective measures did not have their intended effect. (Id. ¶¶ 190-91). ArcelorMittal avers that in the five years after the mill was installed, it never achieved the targeted production increase of 8 million tons per year. (Cross-Petition ¶ 14).

In June 2016, ArcelorMittal initiated an arbitration before the ICC, asserting causes of action under Quebec law,[2] including contract-based claims and a claim for breach of the duty to inform, which, as explained in greater detail below, imposes certain disclosure obligations on contracting parties. (See Award ¶¶ 175-229). To give a high-level overview, ArcelorMittal's position at arbitration was that the mill could not process sufficient ore because it was defectively small, and that Metso knew, but failed to disclose, that its mill design presented risks that could threaten output. (Id.)

On March 20, 2019, following briefing and a merits hearing, a majority of the three-member arbitral panel (the "Majority") issued the Award by a 2 to 1 vote, dismissing ArcelorMittal's claims and awarding Metso most of its fees and costs. (See id.). The third arbitrator issued a dissenting opinion finding

---

[2] The parties agree that Quebec law governs their dispute.

3

that Metso had failed to satisfy the duty to inform. (See Jaffe Decl. Ex. H ("Dissent")).

In the Award, the Majority concluded that Metso's mill was not defective because it met the contract's design criteria and because the mill's disappointing performance was at least partly due to ArcelorMittal's failure to operate it according to the requirements in the contract. (Award ¶¶ 294, 303-04). Based on this finding, the Majority rejected ArcelorMittal's duty to inform claim, stating that in the absence of any defects, the "debate regarding Metso's duty to inform ArcelorMittal of possible defects . . . is meaningless" and that the Majority "does not need to discuss it." (Id. ¶ 294).

In a separate opinion, the dissenting arbitrator found that Metso breached the duty to inform because it had concerns during the design stage about whether the mill could achieve ArcelorMittal's production objectives and failed to communicate those concerns to ArcelorMittal. (Dissent ¶¶ 45-121). The dissent also attacked the Majority's conclusion that the duty to inform claim failed because the mill was not defective:

> Even in the absence of a defect, as found by the Majority, Metso's duty to inform still applies and should have led the latter to inform ArcelorMittal that the Mill agreed upon contractually would not allow [ArcelorMittal] to meet the known annual production objective. It is worth emphasizing that [the statute codifying the duty to inform] imposes a duty to inform <u>before the contract is entered into</u>.

4

* * * * *

> Metso cannot simply argue that the [mill] it supplied met the contract requirements. Metso had to inform ArcelorMittal that what was finally inserted in the contract, with the input of Metso itself, was not adequate in light of ArcelorMittal's objective. Instead, Metso did not warn ArcelorMittal.

(Id. ¶¶ 73, 77 (emphasis in original)).

On April 16, 2019, Metso petitioned to confirm the Award. ArcelorMittal cross-petitioned to vacate the Award on May 17, 2019, arguing that the Majority dismissed the duty to inform claim in manifest disregard of the law. ArcelorMittal's arguments for vacatur largely track the findings and conclusions in the dissenting opinion. (See ArcelorMittal's Memorandum of Law in Opposition to Petition to Confirm Arbitration Award ("ArcelorMittal Br."), dated May 16, 2019 [dkt. no. 22]). ArcelorMittal contends that the Award improperly dismissed the duty to inform claim by limiting its analysis to whether there was a defect in the mill, without examining Metso's failure to tell ArcelorMittal about certain risks in the mill design.

II. Legal Standard

After an arbitral panel issues an award, Section 9 of the Federal Arbitration Act ("FAA") "provides that a party may apply to a district court 'for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in [S]ections 10 and

5

11 of this title." STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 74 (2d Cir. 2011) (quoting 9 U.S.C. § 9). "[C]ourts must grant an arbitration panel's decision great deference. A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388 (2d Cir. 2003).

Under Section 10 of the FAA, courts may vacate an arbitration award on four narrow grounds:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

In addition to those four statutory grounds for vacatur, the Second Circuit has ruled that a court may vacate an award if the arbitrator "exhibited a 'manifest disregard of law.'" See e.g., Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d

200, 208 (2d Cir. 2002) (quoting Wilko v. Swan, 346 U.S. 427, 436 (1953), overruled on other grounds, Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477 (1989)). It is well established that the "manifest disregard" doctrine is one of "last resort" and is limited "only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." Duferco, 333 F.3d at 389; see also Goldman Sachs Execution & Clearing, L.P. v. Official Unsecured Creditors' Comm. Of Bayou Grp., 491 Fed. App'x 201, 204 (2d Cir. 2012) (observing that "[t]he manifest disregard standard is, by design, exceedingly difficult to satisfy").

"The erroneous application of rules of law is not a ground for vacating an arbitrator's award." Siegel v. Titan Indus. Corp., 779 F.2d 891, 892-93 (2d Cir. 1985); see also Goldman v. Architectural Iron Co., 306 F.3d 1214, 1216 (2d Cir. 2002) ("Given the deference afforded arbitration decisions, this standard requires more than a mistake of law or a clear error in fact finding."). A federal court must confirm an arbitration award--even if the court disagrees with it on the merits--so long as there "is a barely colorable justification for the outcome reached." Wallace v. Buttar, 378 F.3d 182, 190 (2d Cir. 2004) (quoting Banco de Seguros del Estado v. Mut. Marine Office, Inc., 344 F.3d 255, 260 (2d Cir. 2003)) (emphasis in original).

7

III. Discussion

ArcelorMittal contends that the Majority's Award manifestly disregards Quebec law on the duty to inform. In evaluating a motion to vacate for manifest disregard of the law, courts examine three questions: (1) "whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrator;" (2) "whether the applicable law was in fact improperly applied resulting in an erroneous outcome;" and (3) "whether the arbitrator intentionally disregard[ed] the law." OldCastle Precast, Inc. v. Liberty Mut. Ins. Co., 16 Civ. 1914 (NSR), 2019 WL 1171564, at *7 (S.D.N.Y. Mar. 12, 2019) (citing Duferco, 333 F.3d at 390). Applying that framework here, the Court finds that ArcelorMittal has failed to meet the extremely high standard for vacating the Award on manifest disregard grounds.

a. Whether Duty to Disclose Law Is Clear and Applicable

With respect to the first prong, the parties do not dispute that the duty to inform was applicable to Metso's dealings with ArcelorMittal, and, with one key exception, they agree that the law on the duty to disclose is clear. Whether the law is clear is significant for purposes of the manifest disregard analysis because "[a]n arbitrator obviously cannot be said to disregard a law that is unclear" or "ambiguous." Duferco, 333 F.3d at 390.

As noted in the parties' briefs, the Supreme Court of

8

Canada has held that the duty to inform arises when one party to contract negotiations has "knowledge of [] information" that "is of decisive importance" and "it is impossible for the party to whom the duty to inform is owed to inform itself." (ArcelorMittal Br. at 8 (quoting Banque de Montréal v. Bail Ltée, [1992] 2 S.C.R. 554, 586-87 (Can.))). The duty to inform has also been codified at Article 2102 of the Civil Code of Quebec ("C.G.C."), which provides that "[b]efore the contract is entered into, the contractor or the provider of services is bound to provide the client, as far as circumstances permit, with any useful information concerning the nature of the task which he undertakes to perform and the property and time required for that task." (Id. at 8 (quoting Civil Code of Quebec, S.Q. 1991, c. 64, art. 2102 (Can.)).

While agreeing on the general parameters of the duty to inform, the parties disagree on whether the duty can be breached in cases where there was no defect in the product at issue. ArcelorMittal argues that the Supreme Court of Canada's decision in ABB Inc v. Domtar Inc., [2007] 3 S.C.R. 461 (Can.), establishes that a duty to inform claim can prevail even when there is no defect. That decision states, in relevant part:

> [T]he scope of the general duty to inform is much broader than that of the disclosure of a latent defect. This duty encompasses any information that is of decisive importance for a party to a contract . . . . It is therefore easy to imagine a situation

9

> in which a seller would be in breach of the duty
> even though no defect exists.

(Declaration of Thomas E. Riley ("Riley Decl."), dated May 16, 2019 [dkt. no. 23], Ex. U ("Domtar"), ¶ 108).

Metso, on the other hand, argues that a separate portion of Domtar, quoted below, demonstrates that if there is no defect, then there can be no breach of the duty to inform, so the court need not analyze it separately:

> Where a seller fails to discharge the duty to disclose a defect . . . it can probably be said at the same time that he or she has also breached the general duty to inform the buyer of a factor of decisive importance in respect of the good sold, namely the existence of a latent defect. . . . If a party invokes the seller's warranty against latent defects, the duty to inform is in a sense subsumed in the analysis of the seller's liability for latent defects, and there is no need for the court to conduct a separate analysis on the seller's duty to inform.

(Id. ¶ 109; see also Metso Reply Memorandum of Law in Further Support of Petition to Confirm Arbitration Award, dated May 28, 2019 [dkt. no. 28], at 8-9).

Metso cites this passage of Domtar apparently in trying to demonstrate an ambiguity in the law, but its interpretation of the case is dubious at best. As ArcelorMittal notes, Domtar only states that if a seller provides a product that has an undisclosed defect, the court can readily conclude that the seller breached its duty to disclose, which would have required informing the buyer of the defect. In that instance, separate

analysis of the duty to inform is unnecessary. (See ArcelorMittal's Reply Memorandum of Law in Support of Cross-Petition to Vacate Arbitration Award, dated June 7, 2019 [dkt. no. 31], at 6). But <u>Domtar</u> does not state, as Metso would have it, that the inverse is also true: <u>i.e.</u>, that if the product has no defects, then the seller necessarily discharged its duty to inform, so no more analysis is needed. To the contrary, <u>Domtar</u> expressly observed that it is "easy to imagine a situation in which a seller would be in breach of the duty <u>even though no latent defect exists</u>." (<u>Domtar</u> ¶ 108 (emphasis added)).

The parties' disagreement on <u>Domtar</u> raises questions, however slight, about whether the law regarding the duty to inform is clear. The Court need not resolve those questions, however, because it concludes that ArcelorMittal has not established manifest disregard of the law under the other prongs of the governing standard.

b. <u>Whether the Law Was Improperly Applied</u>

Assuming, as ArcelorMittal submits, that the duty to inform can be breached even when there is no defect, the Court nevertheless concludes that ArcelorMittal has not shown that the Majority improperly applied that legal principle.

The crux of ArcelorMittal's argument is that the Majority dismissed the duty to inform claim solely because there was no defect in the mill and "conscious[ly] refus[ed]" to examine

11

whether Metso had violated the duty by not telling ArcelorMittal of known risks in its mill design--including, for example, that the design was "unprecedented" and that meeting production targets "would require overloading and overspeeding" the mill in a way that would have been "unsustainable and unsafe." (ArcelorMittal Br. at 3, 18).

But ArcelorMittal's argument presupposes that the Majority was legally required to factor all undisclosed risks into its analysis. The authorities the parties cite make clear, however, that the duty to disclose does not require disclosure of <u>all</u> information--to the contrary, it only requires disclosure of information that is <u>highly significant</u>. (See Riley Decl. Ex. T, Bank of Montréal v. Bail Ltée, [1992] 2 S.C.R. 554, 556 (Can.) (the duty applies when "the information in question is of <u>decisive importance</u>" (emphasis added))); Domtar ¶ 108 ("This duty encompasses any information that is of <u>decisive importance</u> for a party to a contract." (emphasis added))). The dissenting arbitrator further acknowledged this limiting principle: "If there is a duty to inform, the decisive importance of the information must be established." (Dissent ¶ 95).

Notwithstanding ArcelorMittal and the dissenting arbitrator's belief that the undisclosed design risks were indeed of the utmost significance, it is plausible that the Majority did not agree. See Westerbeke Corp., 304 F.3d at 213

12

n.8 ("[W]here the arbitral tribunal has handed down an opinion open to more than one possible reading," the court must "confirm the award so long as, under one of these readings, the judgment rests upon a colorable interpretation of [the] law."); see also Duferco, 333 F.3d at 390 ("Even where explanation for an award is deficient or non-existent, we will confirm it if a justifiable ground for the decision can be inferred from the facts of the case.").

Here, it is plausible that the Majority concluded that the undisclosed risks ArcelorMittal identified were not sufficiently important to warrant disclosure and that the only facts Metso had to disclose were those the Majority examined--namely, whether the mill could meet contractual design criteria and fulfill ArcelorMittal's expectations if operated by ArcelorMittal as contemplated in the parties' contract. (See Award ¶¶ 294, 303-04). Under that circumstance, once the Majority concluded that the mill met those criteria, no further analysis of the duty to disclose was required. (Id. ¶ 294).

ArcelorMittal's disagreement with that conclusion is insufficient to support vacatur. See Duferco, 333 F.3d at 392 ("[I]t is not [the court's] role to substitute [its] judgment for those of [the] arbitrators hired by the parties--this is why [the court's] standard for vacatur is so very high.) Because "[o]nly a barely colorable justification for the outcome

13

reached" is needed to deny a motion for vacatur on manifest disregard grounds, the Court, having found such a justification here, must confirm the Award. D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (emphasis added) (citation and internal quotation marks omitted).

c. Whether the Majority Intentionally Disregarded the Law

With respect to the last prong of the manifest disregard framework, ArcelorMittal has not shown that the Majority intentionally ignored the law. See STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 78 (2d Cir. 2011) ("We . . . will not vacate an award because of a simple error in law or a failure by the arbitrators to understand or apply it but only when a party clearly demonstrates that the panel intentionally defied the law." (citation and internal quotation marks omitted)). Here, the Majority was aware of the legal principles undergirding the duty to inform (see Award ¶¶ 218, 248) and, as discussed above, reached an outcome that plausibly conforms to those principles. ArcelorMittal therefore falls well short of meeting its burden of "clearly demonstrat[ing]" that the Majority intentionally disregarded the duty to inform. See STMicroelectronics, 648 F.3d at 78.

IV. Conclusion

For the foregoing reasons, Metso's motion to confirm the arbitration award is granted [dkt. no. 2], and ArcelorMittal's

14

cross-motion to vacate the award is denied [dkt. no. 25]. The Clerk of the Court is directed to mark the matter closed and all pending motions denied as moot.

SO ORDERED.

Dated:  New York, New York
        November 1, 2019

_____
LORETTA A. PRESKA
Senior United States District Judge